JOHN NERO, PLAINTIFF-RESPONDENT, v. WILLIAM F. HYLAND, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT.

Argued January 9, 1978—Decided May 10, 1978.

214

216

*Mr. Stephen Skillman,* Assistant Attorney General, argued the cause for appellant (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Michael A. Santaniello,* Deputy Attorney General, on the brief).

*Mr. William K. Dickey* argued the cause for respondent (*Messrs. Dickey and Thomas,* attorneys).

The opinion of the court was delivered by

PASHMAN, J. This appeal requires the Court to determine whether information concerning the character and background of a prospective gubernatorial appointee gathered in a "four-way" investigative check made at the behest of the Governor of the State of New Jersey is a public record under the so-called Right to Know Law, *N. J. S. A.* 47:1A–1 *et seq., L.* 1963, *c.* 73, or under the common law. If such an investigative report is a public record for either of these purposes, we must next determine whether access to the contents of that report should nevertheless be denied to a prospective appointee who claims that his reputation was damaged by a public comment of the Governor which allegedly implied that his particular "four-way" background check had yielded unfavorable information.

Although the record is far from complete, the essential facts are undisputed. Governor Byrne had considered appointing John Nero to a position on the New Jersey Lottery Commission. This was rumored in the public press. Nero was a prominent supporter of the Governor in his 1973 campaign and was a well-known public figure in his own right

in Camden County. He is the proprietor of a well-known restaurant, is a former Chairman of the Camden County Municipal Utilities Authority and has served on legislative study commissions.

When the appointment did not come to pass, Governor Byrne was asked at a news conference why he had not appointed Nero to the Lottery Commission. Although the exact words of his response are not known, both parties agree that the thrust of the Governor's answer was that Nero had not been appointed because the then Attorney General, defendant, William Hyland, was concerned over certain information affecting Nero which the standard background check had turned up.[1] Reports of the Governor's response were disseminated by the media throughout the State.

Nero demanded disclosure of the report resulting from the character investigation, presumably in order to defend his reputation. By letter dated April 10, 1975, his attorney was advised that the Attorney General considered the character investigation to be confidential and would not release the report to Nero. This litigation followed.

Nero brought an action in lieu of prerogative writ seeking a judgment granting him access to the files of the character investigation. Cross motions for summary judgment were made. The trial court in a reported opinion, 136 *N. J. Super.* 537 (Law Div. 1975), found that unless the document in question was a public record, Nero had neither a statutory nor common law right of access to the report. The judge first determined that the definition of a public record contained in the Right to Know Law, *N. J. S. A.* 47:1A–2, which includes

---

[1] That standard character investigation or "four-way" check is actually three-pronged. It includes a check of the F. B. I. "rap sheet," State Police records, and interviews of all persons with information relevant to the purposes of the check. The State Police handle this investigation pursuant to orders of the Attorney General, who acts at the behest of the Governor.

\* \* \* all records which are required by law to be made, maintained or kept on file by any board, body, agency, department, commission or official of the State \* \* \*

would not, standing alone, encompass the character investigation report sought. The bases for this conclusion were the fact that the initiation of these investigations is a matter totally within the discretion of the Governor and the Attorney General and the fact that the records so gathered are not required to be kept by any statute or regulation.

However, the judge found merit in the approach taken in *Citizens for Better Ed. v. Camden Bd. of Ed.*, 124 *N. J. Super.* 523 (App. Div. 1973), which read the above-quoted definition from the Right to Know Law *in pari materia* with the definition of a public record contained in the Destruction of Public Records Law, *N. J. S. A.* 47:3–15 *et seq., L.* 1953, *c.* 410:

\* \* \* any paper, written or printed book, document \* \* \* that has been received by any such officer, commission, agency or authority of the State \* \* \* in connection with the transaction of public business and has been retained by such recipient or its successors as evidence of its activities or because of the information contained therein.

[*N. J. S. A.* 47:3–16]

The judge held that an investigatory document of the type received by Attorney General Hyland, retained for the information therein contained, thus constituted a public record for purposes of the Right to Know Law's access requirements.

Nevertheless, the trial court concluded that the public access mandated by that law was subject to exceptions, *N. J. S. A.* 47:1A–1, and that one of the specified exceptions related to executive orders of the Governor. *N. J. S. A.* 47:1A–2. The judge then referred to Executive Order No. 48, issued by former Governor, now Chief Justice, Hughes, which expressly dealt with investigatory files of the New Jersey State Police. The order provides, in pertinent part, that

1. No person having custody of State Police investigative files shall turn over the same to any other person who is not a member of a duly recognized law enforcement agency unless ordered to do so by a court of competent jurisdiction or by the Governor of the State of New Jersey.

2. No person shall divulge the contents of those files to any other person who is not a member of a duly recognized law enforcement agency unless ordered to do so by a court of competent jurisdiction or by the Governor of the State of New Jersey, where the release of such information is likely to subject witnesses or other persons to physical harm, threats of harm, bribes, economic reprisals and other intimidation. No information shall be divulged where the maintenance of secrecy regarding informants is required for effective investigation of criminal activity or the protection of confidential relationships and privileges recognized by law.

[1968 *N. J. Laws* at 1718–1719]

The judge noted that under *Irval Realty Inc. v. Bd. of Public Utility Commissioners,* 61 *N. J.* 366, 372 (1972), the Governor's right to exempt certain public records from disclosure was circumscribed by the last phrase of *N. J. S. A.* 47:1A–1, "for the protection of the public interest." Applying that test, he found that the public interest is best served when background checks of potential public employees obtain as much information as possible and that this salutary goal would be undermined if the sources of such information could not be guaranteed anonymity. Thus, the Attorney General's refusal to disclose the reports to Nero was upheld.

The court went on to determine the inapplicability of *Irval Realty's* directive that trial judges examine the contents of the reports whose disclosure is sought prior to rendering a decision on their accessibility. *See* 61 *N. J.* at 375. The judge observed that requiring submission of an investigatory report to the trial judge would have the effect of creating an absolute right of judicial examination of materials that the Executive had determined should be confidential in order to protect the public interest. The judge also rejected the plaintiff's claim under the common law, basing his decision on the same public policy reasons. Accordingly, the defendant's motion for summary judgment was granted.

The Appellate Division was in substantial agreement with the trial court, but reversed and remanded due to its disagreement with the absolute nature of the holding that investigatory files must of necessity remain confidential. 146 *N. J. Super.* 46 (App. Div. 1977). The appeals court deemed that holding offensive to the spirit of *Irval Realty, supra.* It held that where a governmental official elects to comment on the results of an investigation in a manner reasonably implying derogation of an individual's character in a manner likely to result in broad dissemination of the comment, the judge should make the *in camera* inspection called for in *Irval Realty*:

If in his sound judgment some part or all of the information therein contained should not be revealed, he will so rule. If the whole of the record cannot be shown to the party seeking discovery, but certain portions may be, then the judge should extract these portions and make them available for perusal or direct that such other practical steps be taken as will achieve the desired result.

[146 *N. J. Super.* at 49, citing *Irval Realty, supra,* 61 *N. J.* at 375–376]

Thus, the trial court was instructed to read the files. On the petition of the Attorney General, we granted certification. 74 *N. J.* 264 (1977).

I

█ We hold that character investigations made at the behest of the Governor as chief executive in connection with a contemplated nomination are not public records under the Right to Know Law, *N. J. S. A.* 47:1A–2, since they are not "required by law to be made, maintained or kept on file * * *" by any agency or official of the State. No statute, regulation, executive order or judicial decision requires that the Governor conduct a character investigation of potential nominees to state positions and more specifically prospective members of the Lottery Commission. The Governor, of course, has the privilege of causing such an investigation to

be made, but the procedure is not mandated by law. It follows, therefore, that when a report of a character investigation is made, it is not a "public record" as defined in *N. J. S. A.* 47:1A-2

█ █ The trial court and the Appellate Division erred in holding to the contrary. That result was reached by engrafting upon *N. J. S. A.* 47:1A-2 the definition of a public record contained in the Destruction of Public Records Law, *N. J. S. A.* 47:3-16. *See Trenton Times Corp. v. Trenton Bd. of Ed.,* 138 *N. J. Super.* 357, 360-361 (App. Div. 1976); *Citizens for Better Ed. v. Camden Bd. of Ed.,* 124 *N. J. Super.* 523, 529 (App. Div. 1973). While we recognize that the purpose of the Right to Know Law is the salutary one of promoting a free flow of information in order to ensure an informed citizenry, *see Polillo v. Deane,* 74 *N. J.* 562, 569-572 (1977) for a discussion of the related "Open Public Meetings Act," *N. J. S. A.* 10:4-6 *et seq.,* we cannot approve of any expansion of the plain wording of the definition of public record under that Act. Reading statutes *in pari materia is* a useful technique when two enactments are related and one is somewhat ambiguous on a given point. It is also advisable where one statute will tend to negate the thrust of a related act in the absence of a harmonizing construction. However, where a statutory definition is unambiguous, creative judicial expansion of that definition by reference to a related statute is inappropriate. Here the statutes are not so related that their variant definitions of public record will inhibit the useful functioning of either enactment.

In view of our determination of the inapplicability of the Right to Know Law, the disclosure sought by Nero is not a matter of statutory right.

II

█ █ The common law definition of public record is broader than that contained in the Right to Know Law. A public record under the common law is

* * * one required by law to be kept, or necessary to be kept in the discharge of a duty imposed by law, or directed by law to serve as a memorial and evidence of something written, said, or done, or a written memorial made by a public officer authorized to perform that function, or a writing filed in a public office. The elements essential to constitute a public record are * * * that it be a written memorial, that it be made by a public officer, and that the officer be authorized by law to make it * * *

> [*Josefowicz v. Porter*, 32 *N. J. Super*. 585, 591 (App. Div. 1954), quoting 76 *C. J. S.* Records § 1, p. 112, cited in *Irval Realty, supra*, 61 *N. J.* at 375]

Records of character investigations, or four-way checks, clearly are written memorials[2] made by public officers in the exercise of public functions, which they are lawfully authorized to perform. Several lower courts have adopted the definition of public record appearing in the Destruction of Public Records Law, *N. J. S. A.* 47:3–16. See *ante* at 218, as the common law definition. *See Moore v. Bd. of Chosen Freeholders*, 76 *N. J. Super*. 396, 406–407 (App. Div. 1962), modified 39 *N. J.* 26 (1962); *Guarriello v. Benson*, 90 *N. J. Super*. 233, 236–237 (Law Div. 1966). Arguably, the written portion of the character investigation undertaken herein constitutes a public record under both of these common law definitions.

█ Under the common law rule of access to public documents, a citizen is entitled to inspect documents of a public nature ". . . provided he shows the requisite interest therein." *Ferry v. Williams*, 41 *N. J. L.* 332, 334 (Sup. Ct. 1879). *Ferry* was referring to a need of the document in the prosecution or defense of a legal action. *Id.* at 336. This strict definition of interest was diluted in *Higgins v. Lockwood*,

---

[2]We were advised at oral argument that the subject matter of a character investigation may sometimes be communicated orally to the Governor. Thus, it is not entirely clear that a character investigation is reduced invariably to written form. For purposes of this case, however, it is assumed that these are written reports constituting the four-way investigation in question.

74 *N. J. L.* 158 (Sup. Ct. 1906), which required that plaintiff as an interested citizen be permitted to copy the list of registered voters. Moreover, the recent decision of the United States Supreme Court in *Nixon v. Warner Communications, Inc.,* —— *U. S.* ——, 98 *S. Ct.* 1306, 55 *L. Ed.* 2d 570 (1978) noted that in contrast to the English practice, American decisions do not condition enforcement of the common law right to inspect and copy public records upon a proprietary interest in the document or upon a need for it as evidence in a lawsuit. —— *U. S.* at ——, 98 *S. Ct.* 1306. The Court added that the common law right to inspect and copy public records is not absolute.

█ Nero has a cognizable common law interest in obtaining the materials collected about him. He presumably wishes to defend his reputation in some future legal action. However, the existence of this interest gives him no absolute right to the documents. In *Cashen v. Spann,* 66 *N. J.* 541 (1975) on remand 143 *N. J. Super.* 560 (Law Div. 1976); leave to appeal granted and remanded to App. Div. 72 *N. J.* 473 (1976), aff'd 150 *N. J. Super.* 500 (App. Div. 1977); *cert.* granted 75 *N. J.* 584 (1977), this Court modified an Appellate Division decision, 125 *N. J. Super.* 386, 408 (1974), which held that there is no valid public purpose served by protecting the identity of an informer. We cited *Roviaro v. United States,* 353 *U. S.* 53, 77 *S. Ct.* 623, 1 *L. Ed.* 2d 639 (1957), for the proposition that by making an informer's identity privileged information, the public interest promoting the effectiveness of law enforcement was protected. *Cashen* adopted the *Roviaro* view that

* * * no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the pos-

sible significance of the informer's testimony, and other relevant factors.

[353 *U. S.* at 62, 77 *S. Ct.* at 628, 1 *L. Ed.* 2d at 646; cited in 66 *N. J.* at 553]

We made this rule applicable to civil cases. 66 *N. J.* at 557. Thus, Nero's interest in disclosure must be balanced against the public interest in the confidentiality of these files.

As head of the Executive Branch of State Government, a New Jersey Governor is responsible for making a staggering number of appointments to public office. In many instances, his personal knowledge of a prospective appointee is fleeting at best. The overwhelming importance of having able, honest and honorable persons in all appointive posts is self-evident. A reasonable and expeditious method to investigate prospective appointees in order to further that goal is by the "four-way" check. Moreover, the main reason for the effectiveness of such investigations is that the individuals who are questioned can be assured anonymity. It is extremely unlikely that persons who are questioned pursuant to one of these checks would ever be forthright in responding if their anonymity could not be guaranteed. This undesirable "chilling effect" would be especially pernicious with respect to persons who might otherwise provide information relevant to the prospective appointee's unsuitability for public office.

As indicated in its preamble, this concern was a critical factor in prompting Governor Hughes to issue the very Executive Order considered by the trial judge:

WHEREAS, Certain persons have· suggested that investigative files in the possession of the New Jersey State Police should be made available for inspection contrary to long-standing and well-established policy against such inspection; and

WHEREAS, Recognition of the necessity for the protection of such files in the public interest is clearly established, having, inter alia, been set forth in Supreme Court Rule R. R. 3:5–11(i), in view of the following objectives:

"protection of witnesses and others from physical harm, threats of harm, bribes, economic reprisals and other intimidation; main-

tenance of such secrecy regarding informants as is required for effective investigation of criminal activity; protection of confidential relationships and privileges recognized by law; and other relevant considerations";

WHEREAS, I also deem it to be contrary to the public interest to permit in an indiscriminate searching of these investigative files due to the probable adverse effect that such disclosure would have upon successful criminal prosecutions; *because of the potential threat to the lives and physical well-being of witnesses*, informants and undercover agents whose names are likely to appear in such investigative files; and further, *because of the disastrous effect which such action would have on the cooperative information-sharing arrangements among law enforcement agencies, including the Federal Bureau of Investigation;* * * *

[1968 *N. J. Laws, supra;* emphasis added]

In *Koch v. Department of Justice,* 376 *F. Supp.* 313 (D. D. C. 1974), Judge Gesell noted that "[e]ven inactive investigatory files may have to be kept confidential in order to convince citizens that they may safely confide in law enforcement officials." See *Aspin v. Department of Defense,* 160 *U. S. App. D. C.* 231, 235–237, 491 *F.* 2d 24, 28–30 (D. C. Cir. 1973); *Frankel v. S. E. C.,* 460 *F.* 2d 813, 817 (2 Cir.), *cert.* den. 409 *U. S.* 889, 93 *S. Ct.* 125, 34 *L. Ed.* 2d 146 (1972).

Furthermore, the Governor, as chief executive, must be accorded a qualified power to protect the confidentiality of communications pertaining to the executive function. This power is analogous to the qualified constitutionally-based privilege of the President, which is "fundamental to the operation of government and inextricably rooted in the separation of powers * * *." *United States v. Nixon,* 418 *U. S.* 683, 708, 94 *S. Ct.* 3090, 3107, 41 *L. Ed.* 2d 1039, 1064 (1974). Confidentiality is vital not only because it serves to protect government sources of information, *cf. Roviaro v. United States,* 353 *U. S.* 53, 77 *S. Ct.* 623, 1 *L. Ed.* 2d 639 (1957); *State v. Milligan,* 71 *N. J.* 373 (1976), but also because it enhances the effectiveness of investigative techniques and procedures. More importantly, this executive privilege protects and insulates the sensitive

decisional and consultative responsibilities of the Governor which can only be discharged freely and effectively under a mantle of privacy and security.

■ A vital public interest is clearly involved in the effectiveness of the decision-making and investigatory duties of the executive. *United States v. Nixon, supra; NLRB v. Sears Roebuck & Co.*, 421 *U. S.* 132, 95 *S. Ct.* 1504, 44 *L. Ed.* 2d 29 (1975); *Merrill v. Fed. Open Market Committee of Fed. Reserve System*, 184 *U. S. App. D. C.* 203, 565 *F.* 2d 778 (D. C. Cir. 1977); *Kaiser Aluminum & Chemical Corp. v. United States*, 157 *F. Supp.* 939, 141 *Ct. Cl.* 38 (1958). A qualified privilege for comunications relating to the executive function promotes the effective discharge of these constitutional duties while ensuring that, in appropriate circumstances, disclosure of the privileged material will be forthcoming. In the context of our own governmental structure, it furthers a primary objective of the 1947 Constitutional Convention, namely, the creation of a strong executive. *See* "Report of the Committee on Executive Militia and Civil Officers," 2 *Proceedings of the Constitutional Convention of 1947*, 1121–1122; "Report of the Committee on Revision of the New Jersey Constitution," at 421–423. *See Russo v. Governor*, 22 *N. J.* 156, 166 (1956) (the 1947 Constitution invested the Governor with authority commensurate to his responsibilities).

■ When the danger of possible unjust censure of a candidate for appointment, especially one who is already a public figure whose character and personal attributes are already the subject of legitimate public interest, *see Gertz v. Robert Welch, Inc.*, 418 *U. S.* 323, 344–45, 94 *S. Ct.* 2997, 41 *L. Ed.* 2d 789 (1974), is balanced against the need for effective pre-appointment screening of prospective appointees, the latter interest is far more compelling. We hold that the public interest in maintaining confidentiality outweighs plaintiff's interest in disclosure and that no common law right to total access or *in camera* inspection exists with

respect to materials gathered in character investigations of this kind.

██ The Appellate Division held that in balancing the competing interests, consideration should be given to the fact that the Governor elected to comment on the results of the investigation. The plaintiff argues that this constituted a waiver of the absolute confidentiality of that report. The Governor told the press only that the Attorney General had not recommended appointment of Nero as a result of information revealed by the four-way check. We do not believe this fact justifies release of the material. Nor does it constitute a waiver.

Reversed.

*For reversal*—Chief Justice HUGHES, Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER and Judge CONFORD—7.

*For affirmance*—None.