637 A.2d 1261

ATLANTIC CITY CONVENTION CENTER AUTHORITY, A BODY CORPORATE POLITIC, PLAINTIFF–RESPONDENT, v. SOUTH JERSEY PUBLISHING COMPANY, INC., T/A THE PRESS & SUNDAY PRESS, DEFENDANT–APPELLANT, AND TED BERGMAN, DEFENDANT.

Argued November 29, 1993—Decided March 23, 1994.

*Nelson C. Johnson* argued the cause for appellant (*Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross,* attorneys).

*Fredric L. Shenkman* argued the cause for respondent (*Goldenberg, Mackler & Sayegh,* attorneys).

*Susan R. Oxford,* Assistant Deputy Public Advocate, argued the cause for *amicus curiae* Public Advocate of New Jersey (*Zulima V. Farber,* Public Advocate, attorney).

*Grey J. Dimenna,* Assistant Chief Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Fred DeVesa,* Acting Attorney General, attorney; *Joseph L. Yannotti* and *Mark J. Fleming,* Assistant Attorneys General, of counsel; *Bruce J. Solomon,* Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

O'HERN, J.

"Welcome to the electronic world." These prophetic words were uttered in 1980 by one of the attorneys arguing in *United States v. Myers* (*In re Application of*

*National Broadcasting Co.*)—the first case where members of the broadcast media successfully applied for judicial permission to copy and broadcast videotapes admitted into evidence in a criminal trial.

[David Marburger, *In Defense of Broadcaster Access to Evidentiary Video and Audio Tapes,* 44 *U.Pitt.L.Rev.* 647, 647 (1983) (footnote omitted).]

In this case the media seek to copy and publish audio tapes of a public body's executive sessions (meetings closed to the public) during which personnel matters were discussed. We hold that media representatives are entitled to access to such records of official public action, subject before disclosure to the removal of any confidential or privileged information that may be withheld under our principles of common-law access to public records or related principles of the Open Public Meetings Act, *N.J.S.A.* 10:4–6 to –21. We remand the matter to the Chancery Division for reconsideration of its decision barring access to the tapes.

I

For purposes of this appeal, we accept generally the version of the case as set forth in the brief of the Atlantic City Convention Center Authority (the Authority).

The Authority operates the Atlantic City Convention Center pursuant to *N.J.S.A.* 52:27H–29. As an agency of the State, the Authority conducts its meetings under the Open Public Meetings Act. Its principal responsibility is to oversee the Convention Hall in Atlantic City. The Atlantic County Improvement Authority now owns the Convention Hall, and the New Jersey Sports and Exposition Authority leases it. The Authority operates the Atlantic City Convention and Visitors Bureau (Bureau) as one of its activities.

In 1988, before the Authority became involved with the Atlantic County Improvement Authority or the New Jersey Sports and Exposition Authority, Ted Bergman was the chief officer of its Bureau. Bergman resigned or was fired from employment with the Bureau that year. Pursuant to the Open Public Meetings Act, the Authority went into executive session to discuss Bergman's

personnel performance; therefore, details of that session are not known.

In May and June of 1991, the Authority developed a new position designed to increase business for non-casino hotels in Atlantic City. The Authority discussed the new position in executive session, pursuant to *N.J.S.A.* 10:4–12(b)(8). The Authority hired Bergman as an independent contractor for the purpose of attracting convention business to the Atlantic City area that would use non-casino hotels. The Authority's by-laws permitted tape recording of those executive-session meetings to assist in preparation of the minutes required by law. The South Jersey Publishing Company (the Press) requested that the Authority release the minutes of the executive sessions dealing with the circumstances under which Bergman had left the Bureau and the circumstances under which he had been rehired. The Authority asked Bergman whether he would consent to the release of the executive-session minutes. He would not agree.

Considering itself on the horns of a dilemma in that the Press might have been entitled to the executive-session minutes but Bergman had retained his rights to privacy, the Authority began these proceedings. It requested direction from the court concerning disclosure of the executive-session minutes under the standards set forth in the recently-decided case of *South Jersey Publishing Co. v. New Jersey Expressway Authority,* 124 *N.J.* 478, 591 *A.*2d 921 (1991). The Chancery Division, after reviewing the minutes for any confidential or privileged information, directed that the Authority release the executive-session minutes dealing with Bergman's leaving the Bureau as well as the minutes dealing with the Authority hiring Bergman as an independent contractor. Shortly before the return date of its own motion for disclosure of the minutes, the Press sought release of the tape recordings of the executive sessions as well. To make the drafting of the minutes easier and more accurate and pursuant to Authority by-laws, the

Authority voluntarily tape-recorded general sessions and executive sessions for its own convenience. The Authority opposed the release of the audio tapes of the executive sessions. The Chancery Division ruled that tape recordings of the executive sessions were not "public records subject to disclosure" and that even assuming they were public records, the privacy interest of Bergman and the interests of the Authority in the integrity of the executive process outweighed the interest of the Press in the release of the recordings.

On appeal the Appellate Division, in an unpublished opinion, affirmed the Chancery court, holding that the court had correctly determined the tapes were not public records under the common law or the Right-to-Know Law, *N.J.S.A.* 47:1A–2. Further, the Appellate Division held that the trial court did not need to balance the Press' interest in the release of the tape recordings against the public and private interest in confidentiality because no legal requirement dictated that the tapes should serve as public records.

We granted the Press' petition for certification, 134 *N.J.* 474, 634 *A.*2d 522 (1993).

II

A.

In a long series of cases we have outlined the standards for access to public records. The gender references are a bit dated but the principles are unaffected. We summarize them briefly.

> A person seeking access to public records may today consider at least three avenues of approach. He may assert his common law right as a citizen to inspect public records; he may resort to the Right to Know Law, *N.J.S.A.* 47:1A–1 *et seq.*, or, if he is a litigant, he may avail himself of the broad discovery procedures for which our rules of civil practice make ample provision.
>
> [*Irval Realty Inc. v. Board of Pub. Util. Comm'rs*, 61 *N.J.* 366, 372, 294 *A.*2d 425 (1972).]

■ At common law, however, courts required citizens to demonstrate some "personal" or "particular" interest in the material sought to be examined. *Ibid.* In order to overcome that require-

ment and make official governmental records available to the general public for inspection and copying, the Legislature adopted the Right-to-Know Law, *N.J.S.A.* 47:1A–1 to –4. However, that law does not embrace a definition of a public record that is equivalent to the common-law definition of a public record. *Nero v. Hyland,* 76 *N.J.* 213, 221, 386 *A.*2d 846 (1978). The Right-to-Know Law covers only those records "required by law to be made, maintained or kept on file." *N.J.S.A.* 47:1A–2. Thus, a limited class of records is unqualifiedly available to all citizens under the statute, while a much broader class of records is only qualifiedly available to the public under the common law.

In addition, although our common-law definition of a public record is broader than the Right-to-Know-Law definition, our courts developed that common-law definition long before electronic means of recording information were generally employed. Our cases had held that

[a] public record under the common law is

" * * * one required by law to be kept, or necessary to be kept in the discharge of a duty imposed by law, or directed by law to serve as a memorial and evidence of something written, said, or done, or a written memorial made by a public officer authorized to perform that function, or a writing filed in a public office. The elements essential to constitute a public record are * * * that it be a written memorial, that it be made by a public officer, that the officer be authorized by law to make it * * * "

[*Nero, supra,* 76 *N.J.* at 222, 386 *A.*2d 846 (quoting *Josefowicz v. Porter,* 32 *N.J.Super.* 585, 591, 108 *A.*2d 865 (App.Div.1954).]

■ Finally, even if a party has a cognizable common-law interest in obtaining materials that are part of the public record, a court will not grant an absolute right to the documents. Once a court determines that a party has both an interest and a need for a document, the court must engage in a balancing process "concretely focused upon the relative interests of the parties in relation to [the] specific materials." *McClain v. College Hosp.,* 99 *N.J.* 346, 361, 492 *A.*2d 991 (1985). That process is "flexible and adaptable to different circumstances and sensitive to the fact that the requirements of confidentiality are greater in some situations than in others." *Id.* at 362. We and other courts of the State

have applied this standard in a number of settings. *See North Jersey Newspapers Co. v. Passaic County*, 127 *N.J.* 9, 601 *A.*2d 693 (1992) (considering media representative's interest in obtaining access to telephone numbers called by public officials); *Loigman v. Kimmelman*, 102 *N.J.* 98, 505 *A.*2d 958 (1986) (considering citizen's access to confidential records of prosecutor); *McClain, supra*, 99 *N.J.* 346, 492 *A.*2d 991 (considering injured person's interest in obtaining public hospital's record of evaluation of treatment); *State v. Doliner*, 96 *N.J.* 236, 475 *A.*2d 552 (1984) (considering government agency access to grand-jury minutes); *Shuttleworth v. City of Camden*, 258 *N.J.Super.* 573, 610 *A.*2d 903 (App.Div.) (considering media seeking access to police files and autopsy report of arrestee who was shot while in custody), *certif. denied*, 133 *N.J.* 429, 627 *A.*2d 1135 (1992); *Asbury Park Press, Inc. v. State, Dep't of Health*, 233 *N.J.Super.* 375, 558 *A.*2d 1363 (App.Div.) (considering media request for spread sheet prepared by Department of Health consultant analyzing factual data submitted by hospitals), *certif. denied*, 117 *N.J.* 646, 569 *A.*2d 1344 (1989).

## B.

 Superimposed on those principles of access to public records are the related principles of our Open Public Meetings Act. That Act expresses the public policy of the State of New Jersey with respect to the deliberations of public bodies. The Open Public Meetings Act requires adequate written notice of at least forty-eight hours to the public of all regularly-scheduled governmental meetings and any special meetings. *N.J.S.A.* 10:4–8(d), – 9(a). The Act authorizes public bodies to go into closed sessions to discuss certain categories of matters, including personnel matters, *N.J.S.A.* 10:4–12(b)(8), but requires that each public body keep "minutes of all its meetings." *N.J.S.A.* 10:4–14. The Open Public Meetings Act does not, however, state what must go into the minutes or how much thereof a public body must disclose. Employees or appointees whose status may be adversely affected by such action may request "in writing" that their personnel

matters be discussed at a public meeting. *N.J.S.A.* 10:4–12(b)(8). Presumably that request would have to be made before a meeting.

In *South Jersey Publishing, supra,* our Court explained that a court assessing the need to disclose minutes and records of otherwise confidential personnel matters will

> recognize that the public interest in disclosure is intended to enable the public to make a sound judgment about the reasonableness of the Authority's decision regarding [the employee], which authorized the expenditure of public funds to continue his salary and benefits for a substantial period of time * * * and will balance that public interest against any competing interests * * *, including facilitation of public employee investigations and the confidentiality of personal information in an employee's personnel file.
>
> [124 *N.J.* at 498, 591 *A.*2d 921.]

Finally, if disclosure of information concerning personnel matters is warranted, then the court should conduct an *in camera* review of specific materials and excise, if necessary, any personal information regarding medical and psychological history. *Ibid.*

 Among the interests that a court must consider in balancing disclosure and nondisclosure of information is the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions. The federal Freedom-of-Information Act, under exemption five, 5 *U.S.C.A.* § 552(b)(5), relating to "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency," reflects a policy in favor of an unhindered deliberative process. Courts have sometimes referred to that policy as affording protection from disclosure under the government's "deliberative process privilege." *Federal Trade Comm'n v. Warner Communications, Inc.,* 742 *F.*2d 1156, 1161 (9th Cir.1984). "This privilege permits the government to withhold documents that reflect advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated." *Ibid.* It is conceptually similar to the evidentiary principle that forbids inquiring into the thought processes of decision-makers. *Catalpa Inv. Group, Inc. v. Franklin Township Zoning Bd. of Adjustment,* 254 *N.J.Super.* 270, 275, 603 *A.*2d 178 (Law Div.1991).

We may safely assume that that policy in favor of frank and independent discussion underlies the legislative decision to authorize closed-session discussions in certain categories of matters.

## III

### A.

We first discuss whether the audio tapes constitute Right-to-Know records. This Court has recognized a narrow but important distinction between Right-to-Know records and common-law records. See *Techniscan Corp. v. Passaic Valley Water Comm'n*, 113 *N.J.* 233, 549 *A.*2d 1249 (1988). In *South Jersey Publishing, supra*, the provision of the Open Public Meetings Act that permits public agencies to consider personnel matters in closed session specifically requires that the agencies keep minutes of those meetings and that those minutes be disclosed to the public. 124 *N.J.* at 495, 591 *A.*2d 921. However, in this case, it was not a requirement for the Authority to tape-record the closed sessions. Although if the agency in this case had chosen simply to maintain electronic recordings, either audio or video, of its executive sessions as the official minutes of the meetings, presumably those recordings would be covered by the Right-to-Know Law. In that circumstance, when the tapes serve (as they do in certain court proceedings) as the official record, those tape recordings would be the records "required by law to be made, maintained or kept." *N.J.S.A.* 47:1A–2.

However, in this case, the Authority used the audio tapes merely as a convenience for its own purposes in preparing the official minutes that it recognizes it must disclose under the Right-to-Know Law. The situation is as though a secretary had taken shorthand notes of the meeting. The secretary's transcribed notes, approved by the body, not the notes themselves, would constitute the official record of the meeting. Simply because a public agency uses an electronic note pad in place of a steno pad as a method to prepare "reasonably comprehensible minutes" does

not establish that that electronic record constitutes a Right-to-Know record. *Techniscan Corp., supra,* 113 *N.J.* at 236, 549 *A.*2d 1249. Because the audio tapes of these proceedings served only as a convenient means to enable preparation of the official minutes and were not records required to be "made, maintained or kept," *N.J.S.A.* 47:1A–2, the audio tapes do not constitute Right-to-Know records.

## B.

Notwithstanding that the audio tapes do not constitute Right-to-Know records, we are satisfied that they are common-law records subject to balanced disclosure. That our previous definition of a common-law record was drawn from sources that spoke in terms of traces of ink on paper does not limit its scope. The essence of the common law is its adaptability to changing circumstances. We are satisfied that audio tapes may constitute common-law public records. For example, in *Evidence Rule* 801(e), we define a "writing" to include "sounds, * * * set down or recorded by * * * mechanical or electronic recording * * * and preserved in a perceptible form."

Many jurisdictions have defined public records in terms that specifically include electronic records of events. For instance, Colorado's statute defining "public records" and "writings" states:

"Public records" means and includes all writings made, maintained, or kept by the state or any agency, institution, or political subdivision thereof * * *. It does not include criminal justice records * * *.

"Writings" means and includes all books, papers, maps, photographs, cards, tapes, recordings, or other documentary materials, regardless of physical form or characteristics * * *.

[*Colo.Rev.Stat.Ann.* § 24–72–202(6)–(7) (West 1993).]

*See also Save The Dolphins v. United States Dep't of Commerce,* 404 *F.Supp.* 407, 411 (N.D.Cal.1975) (holding that "[t]he term 'records' in common parlance includes various means of storing information for future reference," and refusing to limit the term "records" to written documents).

In interpreting the federal Freedom-of-Information Act, 5 *U.S.C.A.* § 552, the Supreme Court in *Forsham v. Harris,* 445 *U.S.* 169, 183, 100 *S.Ct.* 977, 985–86, 63 *L.Ed.*2d 293, 305–06 (1980), has incorporated a definition of agency records set forth in the related Disposal of Records Act:

"[R]ecords" includes all books, papers, maps, photographs, machine readable materials, or other documentary materials, regardless of physical form or charac-' teristics, made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business * * *.
[44 *U.S.C.A.* § 3301.]

New Jersey's Destruction of Public Records Law (1953), *N.J.S.A.* 47:3–8.1 to –32, defines a public record as

any * * * photograph, microfilm, sound-recording or similar device, or any copy thereof which has been made or is required by law to be received for filing, indexing, or reproducing by any officer, commission, agency or authority of the State * * * in connection with the transaction of public business and has been retained by such recipient or its successor as evidence of its activities * * *.
[*N.J.S.A.* 47:3–16.]

Thus, the audio tapes made by the Authority of its executive-session meetings fall within that definition of a "public record."

 Other courts considering right of access to audio and video tapes of criminal proceedings have usually concluded that media representatives are entitled, subject to the fair-trial rights of a defendant in particular cases, to access to electronically-stored information in the form of audio or video tapes provided that the information has been offered into evidence in a public trial. *See generally* Jamie A. Grodsky, *The Freedom of Information Act in the Electronic Age: The Statute is not User Friendly,* 31 *Jurimetrics J.* 17 (1990) (urging amendment of the Freedom-of-Information Act to adapt to computer age). We are satisfied that an audio tape or a video tape, prepared to serve as a memorial of something said or done by a public officer or as a memorial of a public proceeding or public business, should be considered a public record under common law.

Although the Authority did not intend the audio tapes to be a permanent memorial of the proceedings to the extent that an official of the Authority preserved the tapes as an aid in the

preparation of the required official minutes, we are satisfied that the tapes fall within the common-law definition of a public record. When we speak of memorial in this context of common law, we do not mean a record that is to be kept but rather one that provides a " 'convenient, appropriate, or customary method' " of documenting official action. *MacEwan v. Holm,* 226 *Or.* 27, 359 *P.*2d 413, 419 (Or.1961) (quoting *International Union, United Auto., Aircraft and Agric. Implement Workers v. Gooding,* 29 *N.W.*2d 730, 735 (Wis.1947)).

Obviously, many complex questions arise with respect to access to electronic data. *See Forsham, supra,* 445 *U.S.* 169, 100 *S.Ct.* 977, 63 *L.Ed.*2d 293 (considering whether information in abstract constitutes public records of agency); *Higg–A–Rella, Inc. v. County of Essex,* 265 *N.J.Super.* 616, 625, 628 *A.*2d 392 (Law Div.1993) (holding that computer tape on which local tax assessments were kept is not Right-to-Know-Law record and county may ask reimbursement for "tremendous amount of data entry, at taxpayer expense").

In the absence of clear guidance, courts have threaded the needle between requirements that the government generate information for those requesting it or that the government merely provide access to information that has already been assembled in the form of hard copy. "In several [Freedom-of-Information Act] cases, the courts have expressed a need for Congress to clarify the numerous gray areas left open by the statute in its application to the new generation of computerized information." Grodsky, *supra,* 31 *Jurimetrics J.* at 45 (footnote omitted). We too have noted that the conceptual models of our Right-to-Know Law do not seem readily adaptable to data collected in this information age and that lawmakers have been considering amendments to that law that would better clarify the definition of records that have to be disclosed and those that may remain confidential. S. 579, 205th Leg., 1st Sess. (1992).

## IV

Once having determined that the audio tapes constitute public records subject to the common-law right of inspection, we

must then apply the balancing test to measure the public interest in access to the information against the individual's privacy rights as reflected through the personnel exemption under the Right-to-Know Law and against the agency's deliberative-process privilege. No doubt exists about the public interest in access to the information. "Enlightened choice by an informed citizenry is the basic ideal upon which an open society is premised, and a free press is thus indispensable to a free society." *Branzburg v. Hayes,* 408 *U.S.* 665, 726, 92 *S.Ct.* 2646, 2672, 33 *L.Ed.*2d 626, 666 (1972) (Stewart, J., dissenting) (footnote omitted). In keeping with that principle, the Supreme Court has held that the right to publish and gather information "is central to the First Amendment and basic to the existence of constitutional democracy." *Id.* at 727, 92 *S.Ct.* at 2672, 33 *L.Ed.*2d at 667. Justice Stein reminded us in *South Jersey Publishing, supra,* that " '[a] popular Government without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both.' " 124 *N.J.* at 491, 591 *A.*2d 921 (quoting Letter from James Madison to W.T. Barry (Aug. 4, 1822), *in* 9 *Writings of James Madison* 103 (G. Hunt ed. 1910)).

As we noted in *South Jersey Publishing, supra,* 124 *N.J.* 478, 591 *A.*2d 921, the requirement, then, is for a careful balancing of the respondents' interest in confidentiality against the public interest in disclosure. In that case we concluded that the Law Division should conduct an *in camera* review of the public records involved (there the minutes of the executive session and memorandum of understanding between the employee and the agency) to ascertain whether the records included confidential or privileged information that the court should excise before disclosure. We believe that those same principles generally apply to the analysis of access to these audio tapes with the following added observations.

First, because the tape recordings disclose what may be in graphic detail the deliberative processes of the members of the public body while in approved executive sessions, the court must

balance as well the public interest in fostering free and frank exchange of views among the members without having the members fear disclosure of their deliberations. Often positions are tentatively advanced or provocatively stated in the course of such deliberations.

Second, because such tapes constitute (absent any question of their authenticity) indisputable evidence of the record of the public event, they tend to have a unique value. Hence, if disputed issues of fact arise, the tapes assume considerable importance to the public in assessing "the reasonableness of the Authority's decision * * *." *South Jersey Publishing, supra,* 124 *N.J.* at 498, 591 *A.*2d 921.

Third, the nature of electronic information is such that difficult problems can surface in assembling the material for review by a court. In the case of paper records, courts have resorted to what is called a *"Vaughn* Index" of documents that will often enable a court to analyze, without exhaustive review, the essence of the documents and to determine whether they shall be disclosed. *Loigman, supra,* 102 *N.J.* at 109–12, 505 *A.*2d 958. A review of a series of audio tapes in order to sift out the necessary information may greatly burden a court. The record in this case reveals that the Authority made twenty-six hours of tapes, with but a few minutes of those tapes relating to Bergman's work. A number of possible solutions exist. One would be for the agency itself to prepare a form of index of the tapes and a summary of their contents. Another solution would be for the court to appoint a master to review the tapes and to submit a report to the court after which the court could view or listen to those selected portions that concern the parties. For example, in this case the need for disclosure would turn on whether anything in the tapes is factually at variance with the official minutes of the meetings. If the master were to report that the minutes, as summaries of the tapes, accurately reflect the substance of the official action, disclosure of the tapes would be unnecessary. Assessing the costs of

the master could abide the court's decision about the need for disclosure.

Finally, blanket access to the tapes would not be required; rather, access could be limited to those portions of the tapes necessary to vindicate the public interest. Just as in *South Jersey Publishing, supra*, if the tapes were necessary to determine the "reasons for the earlier discharge," the Press might be entitled to that information if it were not fully disclosed by the minutes. And as in the case of documents, the court would be free to redact portions of the tapes that constitute either confidential or privileged information, that amount to an invasion of privacy, or that would unnecessarily intrude on the deliberative process. *See Dixon v. Rutgers, The State Univ.*, 110 *N.J.* 432, 541 *A.*2d 1046 (1988) (exploring how court may condition access to privileged academic materials and allowing redaction of names or other identifying material if disclosure of information would interfere with confidentiality of peer-review process). Other jurisdictions take that approach. The Iowa Open Public Meetings Act requires the tape recording of closed sessions of public agencies. *Iowa Code Ann.* § 21.5 subd. 4 (West 1993). Public agencies must seal those recordings, which shall not be public records open to public inspection. However, by court order in an action to enforce Iowa's Open Public Meetings Act, a public agency shall unseal the tape recordings and the court shall examine them *in camera.*

> The court shall then determine *what part*, if any, of the minutes should be disclosed * * *. In determining whether any portion of the minutes or recording shall be disclosed to such a party for this purpose, the court shall weigh the prejudicial effects to the public interest of the disclosure of any portion of the minutes or recording in question, against its probative value as evidence in an enforcement proceeding. After such a determination, the court may permit inspection and use of all or portions of the detailed minutes and tape recording by the party seeking enforcement of this chapter.

> [*Ibid.* (emphasis added).]

*See also United States v. Miracle Recreation Equip. Co.*, 118 *F.R.D.* 100, 107–08 (S.D.Iowa 1987) (holding that court should examine audio tapes of discussions between agency officials to

determine which portions are protected by deliberative-process privilege if alternative sources prove inadequate).

In this case, because the courts below may have been influenced by their determinations that the audio tapes sought did not constitute common-law public records and because the trial court did not determine what portions of the tapes could be released without interfering with the deliberative processes of the agency involved, without interfering with the privacy interests of the employee, or without imposing an undue burden on the court to review the materials, we conclude that the matter should be remanded to the Chancery Division.

We do not contemplate the need for extended proceedings. The Chancery Division may already be familiar with the contents of the tapes; some discussions of the contents took place on the return day of the motion to release the tape recordings. That court has already made a complete analysis of the policy issues that go into the common-law balancing test on the alternative assumption that the tapes were common-law records. It may incorporate its previous findings and review of the materials in making its final adjudication. It need only relate those prior findings to any issues of partial disclosure, or it may reaffirm that because the minutes accurately reflect the substance of official action taken, there is no need for disclosure of the otherwise confidential discussions.

The judgment of the Appellate Division is reversed and the matter is remanded to the Chancery Division for further proceedings in accordance with this opinion.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN—6.

*For affirmance*—None.