ing his arbitration decision. Accordingly, the judgment of the Chancery Division vacating the arbitrator's award is affirmed.

669 A.2d 295

THE HOME NEWS, PLAINTIFF–APPELLANT, v. BOARD OF EDUCATION OF THE BOROUGH OF SPOTSWOOD, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 10, 1995—Decided January 17, 1996.

Before Judges BAIME, KESTIN and A.A. RODRÍGUEZ.[*]

*A.F. McGimpsey Jr.* argued the cause for appellant (*McGimpsey & Cafferty,* attorneys; *Mr. McGimpsey* and *Arlene M. Turinchak* on the brief).

*Pamela J. Minetto* argued the cause for respondent (*Purcell, Ries, Shannon, Mulcahy & O'Neill,* attorneys; *Ms. Minetto* on the brief).

The opinion of the court was delivered by

KESTIN, J.A.D.

Plaintiff newspaper appeals from the trial court's dismissal of its complaint seeking access to certain documents used by members of defendant Board of Education and certain of its officers in the

---

[*] Judge Rodríguez did not participate in oral argument. Counsel have consented to his participation based on the record for the purpose of decision.

budget planning process. Although the complaint contained four separate counts, each asserting a different basis for plaintiff's claim of right to access, only two such grounds are before us in this appeal. An assertion of right under the United States and New Jersey Constitutions in the third count of the complaint was not actively pursued at the trial level. A claim under the Open Public Meetings Act, *N.J.S.A.* 10:4–6 to –21, although pleaded in the fourth count of the complaint and briefed in the trial court, was not addressed by the trial court in its decision and has not been argued on appeal. The issues before us, therefore, are limited to plaintiff's claims under the "Right-to-Know Law", *N.J.S.A.* 47:1A–1 to –4, and the common law right of access, *see Higg–A–Rella, Inc. v. County of Essex,* 141 *N.J.* 35, 46, 660 *A.*2d 1163 (1995). As to these, we affirm.

As stated in the complaint, plaintiff sought access to "copies of the proposed school district budget and supporting documentation[ ]" for the 1994–95 budget year. The record establishes, however, that plaintiff was never denied access to the proposed school district budget, but that what it sought specifically were copies of budget projections and other material used by Board members and officers in the budget planning process. In the Fall of 1993, when the planning process for the 1994–95 budget year began, defendant's Superintendent of Schools requested projections of budgetary need from the district's four school principals and other officers and supervisors. Once received, these projections were turned over to the school district's Business Administrator who compiled them along with other information into a "budget workbook". A similar workbook had been prepared annually for more than nine years; and the contents were discarded at the close of each year's budget planning process. A different color cover was used each year. The budget workbook for 1994–95 was known as the "green book".

In depositions, the Superintendent and the Business Administrator described the "green book", its use in the budget planning process, and how it came to be the subject of this suit. The book

was initially compiled for board members in January 1994, and was continually supplemented and revised during the budget planning process. The book was especially useful at budget workshop meetings, some of which were open to the public and others of which were closed. Initially, it contained only expense estimates because state aid revenue projections had not yet been provided by the State Department of Education. The format of the presentation was substantially similar to the "chart of accounts" provided by the Department that all school districts were obliged to follow, although some of the accounts were presented in the "green book" in more detail than was required by the Department.

The budget process in 1994 lasted until April 7 when the Board voted final approval of the proposed budget after a public hearing had been held. Tentative approval had occurred on March 17 and the tentatively approved budget had been made available to the public on March 22. After one of the budget workshop meetings in late February, a reporter employed by plaintiff had requested a copy of the "green book". The Superintendent did not furnish a copy, but instead prepared a two-page summary of the information to give to the reporter at a March 8 meeting. The reporter was not present at the meeting to receive the summary, and it was discarded because, as a result of the meeting, the figures presented had changed. Plaintiff's complaint seeking access to the "green book" was filed on March 23.

In their depositions, the Business Administrator and Superintendent cited three reasons why the "green book" was not disclosed.

> [I]t lists all the proposed personnel and their salaries and their names which usually will change numerous times before the Board finally adopts a tentative budget. It also goes into detail with our special ed children as to who they are and what schools they are attending and their classifications which are, from my understanding of the law, prohibited under federal law that they have the right of privacy on those.

\* \* \* \* \* \* \* \*

> [The] Public is entitled to a complete budget. That is not a complete budget. And taking individual items out of the context of the complete budget is not giving the public the information that it needs or should have and it's not a complete picture of the financial position of the district.

After a hearing on plaintiff's order to show cause, the trial judge held that plaintiff was not entitled to the relief it sought under either the Right-to-Know Law or the common law right of access. In reaching this conclusion, the trial judge had the benefit of the parties' briefs and oral arguments as well as the depositions of defendant's Superintendent and Business Administrator. A ruling declining to hear the oral testimony of the reporter who sought the information was well within the trial judge's discretion.

This appeal might be seen as moot because, once the 1994–95 budget process concluded, plaintiff may no longer have had any stake in the disclosure of materials used in that process. Defendant, however, has not moved to dismiss on this ground and we will not do so *sua sponte*. The appeal involves an issue which, although typically rendered moot by the passage of time thus evading review, inevitably recurs, probably on an annual basis, and should therefore be addressed, *Clark v. Degnan*, 83 *N.J.* 393, 397, 416 *A.*2d 816 (1980), especially since it is one of considerable public importance, *Division of Youth & Family Serv. v. J.B.*, 120 *N.J.* 112, 118–19, 576 *A.*2d 261 (1990); *Matter of Conroy*, 98 *N.J.* 321, 342, 486 *A.*2d 1209 (1985).

Plaintiff has not met the criteria of the "Right-to-Know Law", *N.J.S.A.* 47:1A–1 to –4, entitling it to access to the disputed material. Once the statutory standard is satisfied, the right to access is absolute. *Higg–A–Rella, supra*, 141 *N.J.* at 43, 660 *A.*2d 1163. "However, the definition of a public record for purposes of the Right-to-Know Law is narrow[,]" *ibid.*, limited to "records which are required by law to be made, maintained or kept on file" by any public body or officer, *N.J.S.A.* 47:1A–2. A person or entity seeking access to a record will succeed by satisfying any one of the three stated criteria. Plaintiff herein has made no such showing.

■ We are unaware of any requirement of law that mandates the preparation or use of a working document such as the "green book" in the budget planning process that boards of education must undertake. While the end result of the process is mandated, *i.e.*, preparation and submission of a proposed budget, individual boards of education and their members and officers are free to develop whatever mechanisms they wish to aid in the process of developing the budget. Without a legal requirement that the particular documents sought must be "made, maintained or kept on file", *N.J.S.A.* 47:1A–2, they "are ... not Right-to-Know documents". *Higg–A–Rella, supra,* 141 *N.J.* at 44–45, 660 *A.*2d 1163; *Atlantic City Conv. Ctr. Auth. v. South Jersey Publishing Co.,* 135 *N.J.* 53, 63–64, 637 *A.*2d 1261 (1994); *North Jersey Newspapers Co. v. Passaic County,* 127 *N.J.* 9, 15–16, 601 *A.*2d 693 (1992); *South Jersey Publishing Co. v. New Jersey Expressway Auth.,* 124 *N.J.* 478, 496, 591 *A.*2d 921 (1991); *Southern N.J. Newspapers, Inc. v. Township of Mt. Laurel,* 275 *N.J.Super.* 465, 478–79, 645 *A.*2d 510 (App.Div.1994), *affirmed as modified,* 141 *N.J.* 56, 660 *A.*2d 1173 (1995); *Asbury Park Press v. Department of Health,* 233 *N.J.Super.* 375, 381, 558 *A.*2d 1363 (App.Div.), *certif. denied,* 117 *N.J.* 646, 569 *A.*2d 1344 (1989).

■ It is, by now, beyond peradventure that the legislative design in "enacting the Right-to-Know Law was full and unrestricted citizen access to all the records that would allow public involvement in most aspects of government," *North Jersey Newspapers, supra,* 127 *N.J.* at 18, 601 *A.*2d 693, to the end of providing "sufficient information to enable the public to understand and evaluate the reasonableness of the public body's action," *South Jersey Publishing, supra,* 124 *N.J.* at 494–95, 591 *A.*2d 921. The manner in which the strict requirements of the Right-to-Know Law and its policy of citizen access to governmental processes should apply in any given context, may best be understood by focusing on the nature of the public involvement anticipated in the particular process at issue. It is by no means evident that the requirement for publishing a proposed school budget and conducting a public hearing thereon before adopting the final budget, does

not fully satisfy the statutory policy of advancing public knowledge and involvement, without unduly impinging on the constructive efforts of public officers to balance considerations and make difficult decisions in the conduct of so sensitive a process as budget development.

 Plaintiff has also failed to meet the test for common law access to the records in question. Although, as defendant concedes, plaintiff, as a newspaper, meets the threshold condition for access, *i.e.,* an interest in the subject matter of the material, *South Jersey Publishing, supra,* 124 *N.J.* at 487, 591 *A.*2d 921, the "green book" involved here was not a public record for common law access purposes.

> Under the common law, a "public record" is "one required by law to be kept, or necessary to be kept in the discharge of a duty imposed by law, or directed by law to serve as a memorial and evidence of something written, said, or done, or a written memorial made by a public officer authorized to perform that function, or a writing filed in a public office. The elements essential to constitute a public record are * * * that it be a written memorial, that it be made by a public officer, and that the officer be authorized by a law to make it." [*Nero v. Hyland,* 76 *N.J.* 213, 222, 386 *A.*2d 846 (1978) (quoting *Josefowicz v. Porter,* 32 *N.J.Super.* 585, 591, 108 *A.*2d 865 (App.Div.1954)).]
>
> [*South Jersey Publishing, supra,* 124 *N.J.* at 487–88, 591 *A.*2d 921.]

 The "green book" consisted of proposals for the coming budget year, financial data from prior years, projections, and notes made by the members of the Board as they worked through the budget process. Its form or content was never fixed, but changed from meeting to meeting, and even more frequently, as information developed and ideas changed. Although some of the materials contained in it were undoubtedly available to plaintiff as public records maintained by Board personnel, the compilation known as the "green book" became something else with the addition of budget proposals and requests, the application of new concepts, and the notes made by individual Board members. It was, in every significant sense, an accumulation of worksheets reflecting presentations and analyses of budgetary information, gathered by the business administrator and others; and it was no more subject to disclosure than any other papers reflecting work in progress toward the goal of producing a document that will

eventually become a public record. As a discrete document, the "green book" was no different from the "spread sheet" at issue in *Asbury Park Press v. Dep't of Health, supra,* 233 *N.J.Super.* at 383, 558 *A.*2d 1363:

> Although a computer print-out of the spread sheet may in other contexts be the equivalent of or constitute a written memorial, it was not such here. The Commissioner was not required by law to prepare or keep such a document. She had no duty to prepare or keep it as a memorial or evidence of something written, said or done; it is not a written memorial made by a public officer "authorized to perform that function." It is also not a writing "filed" in a public office.
>
> *[Ibid.]*

No disclosure rule yet articulated requires the release of drafts and other tentative formulations created in the process of developing a document that, in its final form, will unquestionably be a record to which the public will be entitled to access.

■ Even if the "green book" were to be considered a public record, however, plaintiff has not satisfied its burden in "balancing ... the 'interest of the public ...' in maintaining the confidentiality of the document against plaintiff['s] interest in examining it", *id.* at 383–84, 558 *A.*2d 1363, before access will be granted to it as a common law right. There is an important public interest in permitting public officials engaged in the budget planning process to compile information, consider confidential or sensitive material, make tentative decisions about priorities and needs, evaluate competing claims of sub-entities to diminishing fiscal resources, and freely discuss their respective judgments concerning budget allocation, before figures are bruited about in public discourse with the possibility that they will become prematurely fixed or will raise unfulfillable expectations. As long as the public and the media are not precluded from access to public record data underlying the views that develop in the budget planning process—or that result from the process—it is important, as a matter of public interest, that officials, in budget planning, be unhampered in their thought processes and in the discussions that result in a proposed budget, as well as in the development and use of resource materials they compile or that may be compiled for them in aid of that function. *Cf. id.* at 384–85, 558 *A.*2d 1363. To articulate a rule that might result in imposing limitations on the development of

evolving documents and working positions as the budget planning process proceeds, even in the cause of maximizing public access to public business, is to risk rendering ineffectual the best efforts of those charged with the responsibility of promoting the public interest in this regard.

From the record before us, we have no reason to apprehend that plaintiff was, in any way, precluded from obtaining fiscal information maintained by defendant about prior budgets and expenditures, or any published reports or recommendations for future development, so that it might "free[ly] on its own ... review and analyze the underlying data", *id.* at 385, 558 *A*.2d 1363, in an effort to develop as full as possible an understanding of the proposed budget and its implications. Nor is there any reason to believe that anything tangible was withheld from plaintiff or the public when the proposed budget was published in preparation for the legally required public hearings. The "green book" did not document, express, or represent official action, it was merely a tool provided for the use of those charged with the budget planning responsibility.

Affirmed.