851 A.2d 731 (2004)
370 N.J. Super. 504
BERGEN COUNTY IMPROVEMENT AUTHORITY, Plaintiff,
v.
NORTH JERSEY MEDIA GROUP, INC., d/b/a The Record, a New Jersey Corporation, Defendant-Respondent,
and
Bergen Regional Medical Center, L.P., Defendant-Appellant.
Bergen Regional Medical Center, L.P., Plaintiff-Appellant,
v.
North Jersey Media Group, Inc., d/b/a The Record, a New Jersey Corporation and Shannon D. Harrington, Defendants-Respondents,
and
Bergen County Improvement Authority, Defendant.
Bergen County Improvement Authority, Plaintiff,
v.
Health Professionals And Allied Employees Union, AFT/AFL-CIO, Local 5091, Defendant-Respondent,
and
Bergen Regional Medical Center, L.P., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued June 1, 2004.
Decided July 1, 2004.
*733 James M. Hirschhorn, Newark, argued the cause for appellant Bergen Regional Medical Center, L.P. (Sills Cummis Epstein & Gross, attorneys; Mr. Hirschhorn, on the brief).
Arlene M. Turinchak, Somerset, argued the cause for respondents North Jersey Media Group, Inc. d/b/a The Record and Shannon Harrington (McGimpsey & Cafferty, attorneys; Ms. Turinchak and Thomas J. Cafferty, on the brief).
Leon Savetsky, Hackensack, argued the cause for respondent Health Professionals and Allied Employees Union, AFT/AFL-CIO, Local 5091 (Loccke & Correia, attorneys; Mr. Savetsky, of counsel and on the brief).
Before Judges WEFING, COLLESTER and FUENTES.
*732 The opinion of the court was delivered by FUENTES, J.A.D.
In this appeal we are asked to determine whether certified audited financial reports of affiliates of Bergen Regional Medical Center, L.P. (Bergen Regional), which were prepared at the behest of the Bergen County Improvement Authority (BCIA) and kept on file at its offices pursuant to the provisions of a lease agreement between BCIA and Bergen Regional, are deemed public documents under the common law right of access.
This issue is presented to us in the context of an appeal taken from an order entered by the Law Division in three consolidated actions arising out of requests made by reporter Shannon D. Harrington of The Record newspaper and by representatives of the Health Professionals and Allied Employees Union, Local 5091 (Union), for copies of the annual audited financial statements of Bergen Regional and its affiliated entities. Bergen Regional had provided these records to BCIA pursuant to the Lease and Operating Agreement of Bergen Regional Medical Center, formerly known as Bergen Pines County Hospital.
BCIA and Bergen Regional sought a judicial declaration as to whether the release of these documents was required under either the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13, our State's common law right of access, or both. The Law Division held that these documents were proprietary financial information and thus exempt from disclosure under N.J.S.A. 47:1A-1.1, which excludes *734 from the definition of a government record "trade secrets and proprietary commercial or financial information obtained from any source." This ruling has not been appealed.
The trial court held, however, that BCIA was required to release these documents under the common law right of access. The court, applying the legal principles articulated by the Supreme Court in Keddie v. Rutgers, 148 N.J. 36, 689 A.2d 702 (1997), ordered the records released. The court held that the affiliates' financial reports were "public records" because: (1) Bergen Regional was contractually obligated to prepare and file these documents with BCIA; (2) both The Record and the Union established a cognizable interest in the release of the documents; and (3) the release of the documents was not adverse to the public interest.
Bergen Regional, on behalf of itself and its affiliates, now appeals, arguing that the trial court erred in so holding. It urges us to reverse the court's ruling by harmonizing the common law definition of "public record" with the OPRA definition of "government record," thereby exempting these documents from public disclosure.
We reject these arguments and affirm. We now hold that the common law definition of "public record" is broader than the statutory definition of "government record" contained in N.J.S.A. 47:1A-1.1. Although the public policy expressed in OPRA is entitled to judicial consideration and respect, a court reviewing a citizen's petition for access under the common law must apply the legal principles articulated in judicial decisions to the facts of the case, in order to determine whether access is legally warranted.
In the absence of clear common law direction on the subject, a court engaged in this process may look to OPRA provisions as expressions of public policy on the question of public access to information. However, if disclosure of the information is warranted under the common law, OPRA provisions cannot be invoked to defeat a citizen's right of access.

I
The parties stipulated to the facts at the trial level. An analysis of the issues presented here does not require a complete recitation of those stipulated facts. We will thus only include such facts as are necessary to provide context to our decision.

A
Effective March 15, 1998, BCIA and Bergen Regional,[1] a for-profit privately owned company, entered into a nineteen-year Lease and Operating Agreement, pursuant to which Bergen Regional assumed responsibility to provide all management, administration, operation and maintenance services for the Bergen County Medical Center (formerly known as Bergen Pines County Hospital or Bergen Pines). The preamble of the Lease and Operating Agreement acknowledged and emphasized that for more than eighty years Bergen Pines had provided a "safety net" of health care services to the residents of Bergen County and its surrounding communities. It was thus the *735 express purpose of the Agreement to enhance this health care safety net by providing quality health care services "in an efficient and cost effective manner."
Bergen Regional Medical Center is this State's largest hospital with 1,185 patient beds. It is comprised of three major divisions of care: Acute Care; Long Term Care; and Behavioral Health Services, which provides psychiatric services to both adults and children. As a public health care institution, the Medical Center has an historic and ongoing mission to provide health care services to the poorest among us.
The Medical Center's public hospital license is held by BCIA. Under the Lease and Operating Agreement, Bergen Regional is responsible for the day-to-day operation of the Medical Center. BCIA and the County of Bergen retain certain "reserve powers" concerning the operation of the Medical Center, as well as responsibility for (1) capital improvements and, in certain limited circumstances, (2) continued support of certain programs and services in the absence of available reimbursements.[2] Coupled with BCIA holding the Medical Center's license, this retention of authority by BCIA was expressly intended to satisfy Department of Health and Senior Services' licensing standards, allowing the Medical Center to continue to receive public funding and favorable reimbursement rates from Medicare and Medicaid. According to the parties' factual stipulation number twenty-four: "Such funding and reimbursements have accounted for and will continue to account for a significant portion of the annual revenues earned and retained by [Bergen Regional]." (Emphasis added.) While the term "significant" is not defined in terms of percentage of revenues, we infer from its usage that public funding constitutes a fairly large portion of the Hospital's income stream.[3]
In addition to these direct financial benefits, Bergen Regional has also sought to exploit its association with this public institution by attempting to obtain indirect pecuniary benefits in the form of an exemption from New Jersey State sales tax. In the case of Bergen County Improvement Auth. v. Bergen Reg'l Med. Ctr., L.P., No.XXXX-XXXX (Tax 2001), Bergen Regional's counsel argued that, despite being a for-profit company, Bergen Regional, was:
[E]ntitled, as a matter of law, to make use of BCIA's exemption from sales and use tax on purchases made in connection with [its] operation of the Medical Center as the BCIA's agent. As relief, [Bergen Regional] request[ed] an injunction requiring the BCIA to recognize [it] as [BCIA's] agent for the purpose of the sales tax exemption and a declaratory *736 judgment that [Bergen Regional] [is] entitled to the use of the sales tax exemption.[4]

B
Section 9.25(c) of the Lease and Operating Agreement requires Bergen Regional to prepare and file in the offices of BCIA audited financial statements with respect to its operations "as well as the operations of its subsidiaries and affiliates." Pursuant to this contractual obligation, Bergen Regional filed with BCIA audited financial statements for itself and its affiliates for the years 2000, 2001 and 2002. The Lease and Operating Agreement did not require BCIA to consider these documents confidential or otherwise impose any dissemination restrictions.
On January 21, 2000, in response to Bergen Regional's unilateral attempts to impose limitations for the release of the documents upon BCIA, the parties agreed that BCIA would not "voluntarily disclose any such information, but [would] comply with any order entered by a court of competent jurisdiction directing it to provide the information."
Bergen Regional's audited financial statements for 2001 and 2002 reveal the following information as to the affiliates:
Global Employee Benefits Management, Inc. ("Global") was formed to assist in managing and contracting out insurance benefits for the Medical Center's managed operations.[5] The Medical Center pays Global monthly premiums to manage the employee health insurance claims and other claims. The amount of premiums paid to Global amounted to $18,000,000 in both 2002 and 2001, which is included in employee benefits and related services in the accompanying statements of income. The total amount due Global as of December 31, 2002 and 2001 was $7,080,000 and $8,100,000, respectively, and is included in due affiliates, net in the accompanying balance sheets.
The Medical Center paid Solomon a consulting fee of $7,800,000 in 2002 and 2001. The Medical Center had a consulting agreement with iCare Management LLC, ("iCare"), requiring monthly payments of $135,000 through December 2002. The iCare agreement was extended through December 31, 2003 at monthly payments of $11,000. Consulting fees paid to iCare amounted to $1,650,000 and $1,500,000 in 2002 and 2001, respectively. Consulting fees are included in general and administrative expenses in the accompanying statements of income. The total amount due Solomon at December 31, 2002 and 2001 was $3,250,000 and $3,500,000, respectively, and is included in due affiliates, net in the accompanying balance sheets. Common ownership interests exist in Solomon, the Medical Center, Global and iCare.
Thus, for the years 2001 and 2002, Bergen Regional paid its three affiliates a total of $54.75 million. By contrast, Bergen Regional received a total of $18 million *737 in direct management fees for the same time period.

C
In its ruling in favor of The Record's and the Union's request for the release of the affiliates' audited financial statements, the trial court made the following comments:
[I] wish to make clear that nothing in the record before me establishes any particular reason for concern about the state of financial health of [Bergen Regional] or its affiliates. I am ruling that the financial statements are common law public records in part because they are on file with a public entity pursuant to private entities' contractual [obligations] to do so, and not because of any belief that either [Bergen Regional] or its supporting affiliates are less than financially sound.

....
[Bergen Regional] argues that [its] affiliates will be substantially harmed by the disclosure of its financial documents, because doing so will affect [Bergen Regional's] competitive position. [Bergen Regional] stresses the fact that each affiliate is a privately owned corporation, and that these documents are therefore not ordinarily obtainable by third parties.

....
In the [c]ourt's view the "harm" alleged by [Bergen Regional] is speculative. Indeed, [Bergen Regional] has presented no "hard evidence" to demonstrate that [its] competitive position will be harmed at all by the disclosures at issue. This lack of evidence greatly impacts [Bergen Regional's] position, as it is [Bergen Regional's] burden to demonstrate why [the affiliates'] documents should not be disclosed to the public.
The public has a clear interest in obtaining an understanding of [Bergen Regional's] finances, and of the financial health of the affiliates. The [Medical Center] is the State's largest hospital. It treats thousands of people annually. It has a specific, historic and ongoing mission to provide health services to the poorest among us. The public clearly has a strong interest in knowing [Bergen Regional's] current and future financial picture, as well as that of the supporting affiliates, which implement so much of [Bergen Regional's] responsibilities under the agreement, so as to know whether the quality of the services the public have enjoyed for the past [eighty] years has been or will be placed in jeopardy.

....
[Bergen Regional argues that the public will be prejudiced if the intimate financial details of these public/private ventures are disclosed.] [N]o future corporation would entertain any such venture with the County. I am not persuaded that that is so. First of all, the public entity involved in this case, BCIA, has taken no position on the issue. That, to me, is telling. Second, [Bergen Regional's] financial statements are by law filed with a state agency (NJDHSS) and are indisputably discloseable [sic]. That legal requirement to file financial statements with a state agency did not chill [Bergen Regional] from entering into an agreement with the County. The affiliates' financial statements are public records in part because [Bergen Regional] contractually bound itself to file them with BCIA. I fail to see that a requirement to disclose affiliates' financial statements will fatally chill these ventures, when a requirement to file (and, *738 as subsequently determined, disclose) the parent's ... financials did not have that effect. Lastly, I find that the actual benefits of disclosure substantially outweigh the potential detriments of withholding this information from public scrutiny, as the benefits of a more informed public are self-evident, and the detriment of disclosure is speculative. The public policy of this State is in favor of disclosure of public records. Those opposing disclosure have the burden of proving that the records should not be disclosed. That burden has not been met.
Against this factual backdrop, we will now examine the legal arguments against disclosure presented by Bergen Regional.

II

OPRA and the Common Law Right of Access
New Jersey provides access to public records in three ways: (1) through the citizen's common law right of access; (2) OPRA; and (3) through the discovery procedures applicable to civil disputes. Atlantic City Convention Ctr. Auth. v. South Jersey Publ'g Co., 135 N.J. 53, 59, 637 A.2d 1261 (1994) (citing Irval Realty, Inc. v. Board of Pub. Util. Comm'rs, 61 N.J. 366, 372, 294 A.2d 425 (1972)).
Bergen Regional argues that, in adopting OPRA, the Legislature set out a comprehensive public policy governing the right of access to public records. In so doing, according to Bergen Regional, the Legislature sought to reconcile the two "divergent" rights of access under the former Right to Know Law and at common law. In advancing this position, Bergen Regional urges us to "harmonize" the common law right of access with the limits laid down in the newly-enacted OPRA statute.
We reject this argument because its underlying premise, that OPRA's definition of "government records" should demark the outer limits of a citizen's common law right of access, cannot be reconciled with both the express provisions of OPRA and the public policy underpinning the common law.
In adopting OPRA, the Legislature expressly and unambiguously declared that the common law right of access remained a viable and legally independent means for a citizen to obtain public information.[6]
[N]othing contained in [OPRA], as amended and supplemented, shall be construed as affecting in any way the common law right of access to any record, including but not limited to criminal investigatory records of a law enforcement agency.
[N.J.S.A. 47:1A-1 (emphasis added).]
Nothing contained in [OPRA], as amended and supplemented, shall be construed as limiting the common law right of access to a government record, including criminal investigatory records of a law enforcement agency.
[N.J.S.A. 47:1A-8 (emphasis added).]
Thus, Bergen Regional's argument that the adoption of OPRA signaled a legislative policy shift away from the common law and in favor of a statutory means for accessing public information, palpably lacks textual support.
OPRA defines "government record" as information "made, maintained or kept on file" by a government agency "in the course of its official business" or information *739 that has been "received" by a government agency "in the course of its official business." It affirmatively excludes from such definition, however, twenty-one separate categories of information.[7] By so doing, OPRA significantly reduces the universe of publicly-accessible information.[8] As the Legislature acknowledged in N.J.S.A. 47:1A-1 and N.J.S.A. 47:1A-8, the only countervailing relief mechanism for those seeking access to a statutorily excluded document is the common law right of access.
In Nero v. Hyland, 76 N.J. 213, 386 A.2d 846 (1978), the Supreme Court, for the first time, articulated with particularity the legal principles comprising the common law right of access in the context of a citizen's petition for access to public records.[9]
A public record under the common law is,
one required by law to be kept, or necessary to be kept in the discharge of a duty imposed by law, or directed by law to serve as a memorial and evidence of something written, said, or done, or a written memorial made by a public officer authorized to perform that function, or a writing filed in a public office. The elements essential to constitute a public record are ... that it be a written memorial, that it be made by a public officer, and that the officer be authorized by law to make it[.]
[Id. at 221-22, 386 A.2d 846.]
Nero held that a character investigation report prepared at the behest of the Governor was a "public record." Applying these principles, the Nero Court found that petitioner had "a cognizable common law interest in obtaining materials collected about him." Id. at 223, 386 A.2d 846. The Court ultimately denied release of the report, however, concluding that the public interest in confidentiality outweighed petitioner's *740 right of access. Id. at 227, 386 A.2d 846.
Keddie v. Rutgers, supra, is the latest pronouncement by the Supreme Court on the common law right of access. In Keddie, a Rutgers University professor sought access to attorney billing records under both the Right to Know Law and the common law right of access. The Court upheld the University's refusal to release the records under the Right to Know Law, but directed their release under the common law. The Court found that the documents sought were public records because they were "created by, or at the behest of, public officers in the exercise of a public function." Id. at 50, 689 A.2d 702 (emphasis added).
Here, Bergen Regional's affiliates' audited financial statements are common law public records because they were (1) prepared at the behest of BCIA and (2) filed at its offices pursuant to section 9.25(c) of the Lease and Operating Agreement. This contractual obligation was presumably negotiated and agreed to by the parties to facilitate BCIA's oversight responsibilities as the license holder for this public hospital.[10]
However, concluding that a document is a "public record" under the common law, is only the first step in the analysis. Once a court is satisfied that the information requested is a "public record," it must then ascertain whether the requestor has a cognizable interest in the subject matter contained in the material. Assuming such an individual interest is found, a court must determine whether the individual's right of access outweighs the State's interest in preventing disclosure. Ibid.
Here, Bergen Regional concedes that, as a newspaper, The Record has a cognizable interest in accessing and reviewing the audited financial records of its affiliates. Press of Atl. City v. Ocean County Joint Ins. Fund, 337 N.J.Super. 480, 488, 767 A.2d 533 (Law Div.2000) (citing Red Bank Register, Inc. v. Board of Educ. of Long Branch, 206 N.J.Super. 1, 9, 501 A.2d 985 (App.Div.1985)). See also Home News v. State Dep't of Health, 144 N.J. 446, 454, 677 A.2d 195 (1996); South Jersey Publ'g Co. v. New Jersey Expressway Auth., 124 N.J. 478, 496-97, 591 A.2d 921 (1991).
As the bargaining agent for a significant percentage of the staff at the Medical Center, the Union argues that it has a legally valid private interest in reviewing this information. Bergen Regional contends that any disclosure which may be required under the common law does not apply to the Union, because state law in this area is preempted by the federal Labor Management Relations Act of 1947. 29 U.S.C.A. §§ 141 to -187.
We note that Bergen Regional has not cited any case law supporting its blanket assertion of preemption. However, we do not need to decide this issue in order to afford the Union access to this information. As the trial court correctly noted, denial of the information to the Union here would lead to the absurd result of the Union "being precluded from directly procuring *741 this information under the common law, but could read all about it in the newspapers with the rest of the world."
The principal legal issue in dispute is centered on the final step in the analysis under the common law right of access. That is, whether the public's interest in withholding the release of the affiliates' audited financial statements outweighs the public benefit derived from their disclosure. Here again, Bergen Regional directs our attention to the provisions in OPRA as a means of resolving this conflict.
As previously noted, OPRA affirmatively excludes from the definition of "government records" twenty-one separate categories of information. Among the information excluded are "trade secrets and proprietary commercial or financial information obtained from any source." N.J.S.A. 47:1A-1.1. Bergen Regional argues that these exclusions represent the Legislature's considered public policy judgment that the prejudice caused by the disclosure of this type of information exceeds the benefit derived from its public dissemination. Thus, when confronted with a petition for disclosure under the common law, courts should defer to the Legislature's pronouncement on the subject.
We disagree. In our view, the provisions in OPRA explicitly retaining the common law right of access impose a non-delegable duty upon the judiciary to apply the common law standards and make an independent assessment whether disclosure is warranted. If the Legislature intended to derogate from this common law principle, it would have so stated. Peterson v. Ballard, 292 N.J.Super. 575, 583, 679 A.2d 657 (App.Div.), certif. denied, 147 N.J. 260, 686 A.2d 761 (1996). We do agree, however, that when engaging in the balancing test required under the common law, a court may look to the exclusions in OPRA as expressions of legislative policy on the subject of confidentiality. However, if application of common law principles would lead to a finding in favor of disclosure, OPRA provisions cannot be invoked to defeat a citizen's right of access.
We recognize that administrative regulations bestowing confidentiality upon an otherwise public document, although not dispositive of whether there is a common law right to inspect a public record, should, nevertheless, weigh "very heavily" in the balancing process, as a determination by the Executive Branch of the importance of confidentiality. Home News v. State Dep't of Health, supra, 144 N.J. at 455, 677 A.2d 195; Southern New Jersey Newspapers, Inc. v. Township of Mt. Laurel, 141 N.J. 56, 76, 660 A.2d 1173 (1995). In determining whether disclosure is warranted here, Bergen Regional urges us to show a similar deference to the Legislature's declaration in OPRA conferring confidentiality upon proprietary financial information "obtained from any source," by excluding such information from the definition of "government record" in N.J.S.A. 47:1A-1.1.
Such an approach, however, cannot be reconciled with the Legislature's unequivocal injunction in N.J.S.A. 47:1A-8 that "[n]othing in [OPRA] shall be construed as limiting the common law right of access to a government record...." We glean from this straightforward language a legislative mandate to review and determine a citizen's common law petition for access using judicially developed common law principles, without permitting any of the provisions in OPRA, including the exclusions enumerated in N.J.S.A. 47:1A-1.1, to heavily influence the outcome of the analysis.
Having concluded that OPRA exclusions do not limit a citizen's common law right of access, we will now address *742 whether the trial court correctly applied the common law balancing test. That test was succinctly described by the Supreme Court in Keddie v. Rutgers, supra, 148 N.J. at 51, 689 A. 2d 702:
Generally, the public's interest in nondisclosure is based on the need to keep the information confidential. Where a claim of confidentiality is asserted, the applicant's interest in disclosure is more closely scrutinized. In that context, courts consider whether the claim of confidentiality is "`premised upon a purpose which tends to advance or further a wholesome public interest'" or a legitimate private interest. However, where the interest in confidentiality is "slight or non-existent," standing alone will be sufficient to require disclosure to advance a legitimate private interest.
[Citations omitted.]
Here, as the trial court noted, BCIA does not assert a public right to confidentiality. It is rather Bergen Regional, on behalf of itself and its affiliates, that asserts: (1) that without confidentiality, private for-profit companies, fearing the release of their proprietary financial information, would be discouraged from contracting with government agencies; and (2) release of this information would put them at a competitive disadvantage. Bergen Regional offers no proof of such prospects, however, calling them common sense, self-evident propositions.
The trial court found Bergen Regional's arguments in this respect to be speculative and far from self-evident. So do we. First, as noted by the trial court, Bergen Regional is legally required to file copies of its audited financial statements with the Department of Health and Senior Services. N.J.A.C. 8:31B-3.3. Second, and perhaps most importantly, the original Lease and Operating Agreement makes no provision for keeping the affiliates' audited financial statements confidential.
This Agreement reflects an exceedingly sophisticated understanding of New Jersey's legal environment. Bergen Regional's subsequent actions agreeing to modify the Lease and Operating Agreement by authorizing BCIA to release the information upon the issuance of an order from a court of competent jurisdiction, further reflects an informed acceptance of the legal risks involved. Finally, based on the financial records made available to us, Bergen Regional has continued to enjoy financial success notwithstanding the potential for disclosure.
Conversely, the public's interest in examining these financial records is self-evident. As our recitation of the facts demonstrates, there are large amounts of public funds being disbursed to procure management services for this public hospital. The fees paid to these three affiliates constitute more than three times the annual management fee paid to Bergen Regional. The scope of consulting services provided by the affiliates range from employee benefits to long term patient care. The citizens of Bergen County and of this State have an unquestioned interest in ensuring that public funds, in the form of preferential reimbursement rates, are being spent wisely, efficiently and consistent with the Medical Center's mission.
A citizen's right to obtain and review public information is historically rooted in the proposition that the government holds public information in trust for the people. As eloquently stated by Judge Dixon 125 years ago in Ferry v. Williams, 41 N.J.L. 332, 334 (Sup.Ct.1879): "[E]very officer appointed by law to keep records ought to deem himself for that purpose a trustee." Our republican form of governance is only possible when citizens have access to the *743 information necessary to make a rational and informed judgment.

III

Conclusion
The trial court correctly applied the elements of the common law right of access in ordering the release of the audited financial statements of Bergen Regional's three affiliates.
Affirmed.
NOTES
[1] The lease document actually names Solomon Health Care Group, LLC and Bergen Regional as lessees. Solomon entered into an Assignment and Guarantor Agreement with Bergen Regional, pursuant to which Bergen Regional assumed all of the rights and obligations of Solomon under the BCIA Lease and Operating Agreement and Solomon guaranteed the performance by Bergen Regional of all of its "Management Services" obligations under the BCIA Lease and Operating Agreement.
[2] By way of example, section 3:11(b) of the Lease and Operating Agreement provides that:

Notwithstanding anything described herein to the contrary, implementation of any proposed material reductions in staffing by [Bergen Regional] shall be subject to the prior approval of the BCIA (after receipt of an advisory report concerning such proposed staff reduction from the Oversight Board), which approval shall not be unreasonably withheld. In the event that the BCIA does not approve the proposed reduction in staffing, [Bergen Regional] shall be obligated to maintain staffing at the levels in effect prior to the proposed reduction. In such event, the BCIA shall make payment to [Bergen Regional] for its increased costs (subject to Cost Substantiation) of such disapproval. Such payments shall be in addition to and separate from the Management Fee.
[Emphasis added.]
[3] Bergen Regional's certified financial statements for the years ending December 31, 2001 and 2002 reflect a net patient services revenue of $137,777,580 and $135,199,700, respectively.
[4] This statement is taken from a letter dated September 6, 2001, written by Bergen Regional's counsel to Judge Peter Pizzuto. The letter was included as an exhibit in Bergen Regional's appendix.
[5] At oral argument Bergen Regional's counsel declined to respond to our specific question of whether any of the affiliates were created for the purpose of fulfilling Bergen Regional's management responsibilities under the Lease and Operating Agreement. As the record here indicates, the largest of the three affiliates, at least in terms of fees paid, was created for the express purpose of performing one of Bergen Regional's contractual duties, the management of employee benefits.
[6] In fact, as we have recently noted, in replacing the Right to Know Law with OPRA, the Legislature retained the original statement of legislative purpose and findings, N.J.S.A. 47:1A-1. See Hartz Mountain Indus., Inc., v. New Jersey Sports and Exposition Auth., 369 N.J.Super. 175, 183 n. 2, 848 A.2d 793 (App. Div.2004).
[7] N.J.S.A. 47:1 A-1.1 provides for a wide variety of excluded information. Generally, they cover the following topics: (1) information received by a legislator from a constituent; (2) records used by legislators in the course of their official duties; (3) certain crime scene and autopsy photographs or videotapes; (4) criminal investigatory records; (5) victims' records; (6) trade secrets and other proprietary commercial or financial information; (7) information subject to the attorney-client privilege (excluding the non-privileged portion of lawyers' bills); (8) information that would jeopardize computer security; (9) information that would jeopardize the security of buildings, facilities or persons therein; (10) certain security measures and surveillance techniques; (11) information that would give an advantage to competitors or bidders; (12) information generated by public employers or employees in connection with any sexual harassment complaint or grievance; (13) information which is a communication between a public agency and its insurance carrier, administrative service organization or risk management office; (14) information required by court order to be kept confidential; and (15) that portion of any document which discloses the social security number, driver license number, credit card number or unlisted telephone number of any person, except as enumerated. In addition, six categories of information held by public institutions of higher education are also excluded from the definition. N.J.S.A. 47:1A-1.1.
[8] In fact, unlike the Right to Know Law where disclosure was mandated once statutory access was established, the government under OPRA may seek to withhold any public record subject to the common law balancing test by claiming that the public interest for confidentiality outweighs the private right of access. N.J.S.A. 47:1A-9; In Re Readoption with Amendments of Death Penalty Regulations, 367 N.J.Super. 61, 74, 842 A.2d 207 (App.Div.2004).
[9] Although in the earlier case of Irval Realty, supra, 61 N.J. at 375, 294 A.2d 425, the Court referred to the common law "rule" as an independent basis for a citizen to obtain access to public records, it did not set out the elements as described in Nero.
[10] The oversight responsibilities are described in section 3.2 of the Lease and Operating Agreement, which provides in pertinent part:

Consistent with its responsibilities as the holder of the Bergen Pines License and the Bergen Pines Licensed Capacity, and, notwithstanding the obligation of [Bergen Regional] to provide Management Services under the terms of this Agreement, during the term of this Agreement, the BCIA shall establish and maintain a Contract Compliance Unit that will work with an Oversight Board to monitor operations at Bergen Pines and compliance by [Bergen Regional] with its obligations pursuant to this Agreement.