166 A.3d 1125

IN THE MATTER OF THE NEW JERSEY FIREMEN'S ASSOCIATION OBLIGATION TO PROVIDE RELIEF APPLICATIONS UNDER THE OPEN PUBLIC RECORDS ACT JEFF CARTER, THIRD–PARTY PLAINTIFF–RESPONDENT, v. JOHN DOE, THIRD–PARTY DEFENDANT.

Argued January 18, 2017—Decided August 3, 2017

*John C. Gillespie* and *George M. Morris* argued the cause for appellant New Jersey State Firemen's Association (*Parker McCay*, attorneys; *Stacy L. Moore, Jr.*, on the briefs).

*C.J. Griffin* argued the cause for respondent Jeff Carter (*Pashman Stein*, attorneys; *C.J. Griffin* and *Walter M. Luers*, of counsel and on the briefs).

*Thomas J. Cafferty* argued the cause for amicus curiae New Jersey Press Association (*Gibbons*, attorneys; *Thomas J. Cafferty*, *Nomi I. Lowy*, and *Lauren James-Weir*, on the briefs).

JUSTICE SOLOMON delivered the opinion of the Court.

We are asked to decide whether, after a public entity denies a citizen's record request, the New Jersey Open Public Records Act (OPRA), *N.J.S.A.* 47:1A-1 to -13, and the common law right of access preclude the public entity from instituting a proceeding under the Declaratory Judgment Act (DJA), *N.J.S.A.* 2A:16-50 to -62. We also decide whether the records sought in this case— financial relief checks that the New Jersey Firemen's Association (Association) issued to one of its members, John Doe [1]—are exempt from disclosure under OPRA and the common law right of access.

A month after the Appellate Division declared the Association to be a "public entity," *Paff v. N.J. State Firemen's Ass'n*, 431 *N.J.Super.* 278, 290, 69 *A.*3d 118 (App. Div. 2013), plaintiff Jeff Carter submitted a request for the Association to release Doe's financial relief application and supporting documentation, as well as the relief checks the Association provided to Doe. The Association refused, contending that disclosure would compromise the reasonable expectation of privacy that applicants, such as Doe, have when seeking its assistance. Carter renewed his request, claiming he was entitled to certain payroll records with appropriate redactions.

---

[1] The requested records identified John Doe by name, but the name is redacted in the public record on appeal.

The Association responded by filing a declaratory judgment action to obtain a judicial determination of its responsibilities under OPRA when it is asked to disclose the personal financial information of its members. Carter answered, counterclaimed, and filed a third-party complaint against Doe. At that point, Carter narrowed his records request to the relief checks paid to Doe.

The trial court found that, under OPRA and the common law, Doe's privacy interest outweighed the public's interest in disclosure. The Appellate Division reversed and held that the Association's DJA complaint was improper because OPRA exclusively vests the requestor, not the custodian, with the right to institute a proceeding. The Appellate Division also determined that Doe's privacy interest was not substantial enough to outweigh the public's interest in government transparency.

We reverse the judgment of the Appellate Division and conclude that OPRA does not, in all instances, prohibit a public entity from instituting proceedings under the DJA to determine whether records are subject to disclosure. In addition, after carefully balancing the public's interest in accessing information against the private interest in confidentiality, we find that the relief checks to Doe are exempt from disclosure under OPRA and the common law right of access.

I.

The record before us reveals the following. Statutorily created in 1885, *L.* 1885, *c.* 122, § 24, the Association is vested with the mission to provide welfare and death benefits to qualified active and retired volunteer, part-time, and paid firefighters and their families. Until June 2013, the Association operated as a private entity. *Paff, supra,* 431 *N.J.Super.* at 290, 69 *A.*3d 118.

A month after it was designated a "public agency," *ibid.*, the Association received its first OPRA request, in which Carter sought the following:

1. Copies of record(s) (including attachments) submitted by [Doe], Local 501 agent(s), and/or NJSFA agent(s) seeking financial benefits described in the "BACKGROUND" section above from January 1, 2008 through July 15, 2013.

2. Copies of record(s) (including attachments) sent to [Doe], Local 501 agent(s), and/or NJSFA agent(s) disbursing financial benefits described in the "BACK-GROUND" section above from January 1, 2008 through July 15, 2013.

3. If no record(s) are responsive to Items No. 1 or 2 above, then copies of the front and back of every check providing relief and/or similar benefits, both State and Local, paid to [Doe] between January 1, 2008 through July 15, 2013. (Note that checks are not required if responsive records are provided for Items No. 1 and 2 above.)

Carter's motivation for the request was to publicize the fact that Doe had been charged with endangering the welfare of a child and consequently resigned from his position with the Millstone Valley Fire Department. It was Carter's belief that "hardship benefits are limited and are designed for those who did not directly contribute to and/or cause their resulting need for [such] benefits." Thus, Carter determined that it would be "an insult to deserving firefighters and their families" who justly acquire benefits if Doe was "receiving hardship benefits for behavior that appear[ed] to be caused entirely by [Doe's] own actions."

Five days later, the vice president of the Association denied Carter's request via e-mail, stating that relief applicants have a reasonable expectation of privacy that would be violated if their application materials, which contain detailed personal financial information, were disclosed.

In an e-mail response, Carter reiterated that, because he did not seek any "legitimately defined privileged or exempt information," the Association was obligated to release the requested financial records with the appropriate redactions. Carter also renewed his original request by stating that "the timeframe for my original request will resume on the next business day." Carter concluded his e-mail with a request for a copy of the policy and/or procedures governing how the Association processes relief applications.

The Association disclosed to Carter its program guidelines, the instructions it provides to prospective applicants, and other gener-

al materials describing the manner in which its Board of Trustees reviews applications. The Association refused to disclose Doe's records, claiming the detailed personal financial information contained in the application raised privacy concerns. Moreover, the Association claimed its application materials led applicants to believe that the entrusted information would remain confidential.

When efforts to amicably resolve the matter proved unsuccessful, the Association filed a declaratory judgment complaint and proposed order to show cause to establish its obligation to disclose the financial records that Carter requested. Specifically, Count One of the complaint sought an order:

a. Declaring that individual relief applications are of such a private nature that the [ ] Association or the local relief association shall be prevented from acknowledging the existence of individual applications and prohibited from releasing the same under ... [OPRA];

b. Declaring that a Requestor, in order to determine whether the [ ] Association or the local relief association is performing its duties appropriately, may request a series or date range of applications, but said applications may only be released upon the redaction of all personal information including the requestors' names, addresses, [and] account numbers.

The second count sought identical relief under the common law right of access. The Association maintained that the records were exempt from disclosure under both OPRA and the common law because disclosure would violate Doe's reasonable expectation of privacy. The Association also sought an order compelling Carter to demonstrate why Doe's financial records were not exempt from disclosure.

The trial court agreed with the Association that applicants have a personal right of privacy in their relief applications and entered the Association's order to show cause. After retaining counsel, Carter filed his opposition to the order to show cause, seeking dismissal of the complaint and arguing that the Association's declaratory judgment action was barred by section 6 of OPRA, *N.J.S.A.* 47:1A–6, which vests the right to institute proceedings relating to OPRA solely in the records requestor. Carter also filed a counterclaim and a third-party complaint against Doe.[2] At that

---

[2] Doe never responded to the third-party complaint.

point, Carter further narrowed the scope of documents he sought to copies of checks issued to Doe.

In a supporting certification, Carter claimed that Doe was an elected fire commissioner and volunteer firefighter who was discharged for conduct unbecoming a township employee. Thus, according to Carter, Doe's privacy interest could not outweigh the public's interest in knowing whether the Association provided financial assistance to a government employee discharged for inappropriate conduct.

In a responsive certification, the Association's vice president explained that the organization's goal is to provide qualifying members with relief after an anonymous, non-discriminatory application evaluation process that protects the members' privacy and dignity during their time of need.

The trial court reviewed in camera Doe's financial relief application and, after oral argument, denied Carter's request for dismissal. After applying the seven factors outlined in *Burnett v. County of Bergen*, 198 *N.J.* 408, 427, 968 *A.*2d 1151 (2009) (adopting factors announced in *Doe v. Poritz*, 142 *N.J.* 1, 88, 662 *A.*2d 367 (1995), to analyze OPRA), the court held that OPRA's privacy exemption barred release of relief applications, names of applicants, and amounts paid through the Association's financial assistance programs. The court then balanced the six factors set forth in *Loigman v. Kimmelman*, 102 *N.J.* 98, 113, 505 *A.*2d 958 (1986), and determined that the common law did not require disclosure. The court also denied Carter's request for attorney's fees under OPRA.

Appearing pro se, Carter appealed. The Appellate Division reversed, holding that OPRA provides the exclusive remedy in cases involving public records requests and that the Legislature made clear that only requestors are entitled to seek review of OPRA decisions. *In re N.J. Firemen's Ass'n Obligation to Provide Relief Applications under Open Public Records Act*, 443 *N.J.Super.* 238, 245, 128 *A.*3d 716 (App. Div. 2015). The Appellate Division found that neither OPRA's privacy exemption, nor the

privacy considerations encompassed in the common law right of access, could shield Doe's payment records. *Id.* at 269, 128 *A.*3d 716. The Appellate Division remanded the matter for a determination of attorney's fees.[3] *Id.* at 271, 128 *A.*3d 716.

In a concurring opinion, Judge Messano expressed his belief that the majority was unnecessarily "paint[ing] with ... a broad brush" because there could be circumstances in which it would be appropriate for a public agency to seek declaratory relief. *Id.* at 273, 275, 128 *A.*3d 716 (Messano, P.J.A.D., concurring).

We granted the Association's petition for certification. 224 *N.J.* 528, 135 *A.*3d 148 (2016). The New Jersey Press Association (NJPA), which appeared as amicus curiae in the Appellate Division, retained its amicus status pursuant to *Rule* 1:13–9(d).

## II.

### A.

The Association acknowledges that OPRA's function is to make identifiable government records "readily accessible for inspection, copying, or examination." *N.J.S.A.* 47:1A–1. Additionally, the Association concedes that section 6 of OPRA prohibits record custodians from instituting OPRA suits, a right exclusively reserved for requestors.

However, the Association emphasizes that, as a public agency, it "has a responsibility and an obligation to safeguard from public access a citizen's personal information with which it has been entrusted when disclosure thereof would violate the citizen's reasonable expectation of privacy." *N.J.S.A.* 47:1A–1. The Association observes that, although OPRA attempts to strike a balance between the competing interests of citizens' privacy and government transparency, it fails to instruct public agencies on how to execute their duties without violating citizens' privacy rights. The Associa-

---

[3] The amount of attorney's fees was subsequently settled, but payment was stayed pending this appeal.

tion states that it accordingly availed itself of the DJA both to determine the legality of disclosing applicant information in response to Carter's request and to ensure that firefighters in need can apply for benefits without fear that the sensitive information in their financial and/or medical records could one day be disclosed to the public.

The Association maintains that OPRA can be readily squared with the DJA because OPRA does not expressly, or even impliedly, prohibit a public agency from filing a complaint under the DJA. Rather, the Association interprets section 6 of OPRA to foreclose custodians from "institut[ing] any proceeding under this section." *N.J.S.A.* 47:1A-6 (emphasis added). Specifically, the Association argues that "under this section" refers to Title 47 of the New Jersey Statutes, which deals exclusively with OPRA, and not to statutory provisions contained in other titles—such as the DJA, which appears under Title 2A. Contrary to the Appellate Division's opinion, the Association finds it implausible that the Legislature would have intended to bar public agencies' access to the judicial system when a genuine justiciable dispute arises, even if the issue relates to OPRA. The Association warns that, under the Appellate Division's interpretation of OPRA, public agencies are "sitting duck[s]" left with no alternative but to wait to be sued and potentially "hit with substantial prevailing party fees."

## B.

Carter asserts that the plain language of section 6 of OPRA makes clear that only the requestor holds the right to initiate proceedings regarding a public agency's decision to provide public access to records. Carter argues that, when a public agency is unsure whether disclosure would violate a citizen's reasonable expectation of privacy, OPRA clearly dictates that the agency has two options: (1) release the record as a governmental record, or (2) deny access pursuant to one of OPRA's enumerated exemptions. Thus, Carter maintains that the Association had no legal right, even under the DJA, to seek judicial guidance in this case.

Carter accuses the Association of focusing too heavily on the language "under this section" in section 6. According to Carter, the proper point of emphasis in section 6 is that the right to institute "any proceeding" belongs to the requestor. Carter interprets that language as evidence of a legislative intent to bar records custodians' access to the court system by way of any other statutory provision. Carter argues that allowing public agencies to sidestep OPRA's requirements via the DJA would eradicate the exclusive right that OPRA bestows upon requestors to choose to institute a proceeding and select the forum in which the dispute is resolved—either the Government Records Council or the Superior Court. Carter warns that allowing public agencies to utilize the DJA would chill OPRA requests because it would force requestors to litigate when they might not have done so otherwise, or even dissuade requestors from making OPRA requests in the first place for fear of being sued as a result.

## C.

As amicus curiae, the NJPA submits that the Legislature intentionally vested all statutory standing in the requestor. According to the NJPA, the fact that OPRA was passed after the DJA shows that the Legislature deliberately chose not to include a provision in OPRA allowing public agencies to file declaratory judgment actions. The NJPA also argues that allowing public agencies to seek a declaratory judgment in this context would improperly shift the burden of proof to the requestor to prove the unlawfulness of the denial, instead of leaving the burden on the government to prove the denial is justified by one of OPRA's exemptions. The NJPA highlights, further, that the DJA is designed to provide a remedy for live controversies, not future ones.

## III.

We exercise plenary review over issues of statutory interpretation. *State v. Williams*, 218 *N.J.* 576, 586, 95 *A.*3d 721 (2014). Likewise, determinations about the applicability of OPRA

and its exemptions are legal conclusions, *O'shea v. Township of West Milford*, 410 *N.J.Super.* 371, 379, 982 *A.2d* 459 (App. Div. 2009); *Asbury Park Press v. County of Monmouth*, 406 *N.J.Super.* 1, 6, 966 *A.2d* 75 (App. Div. 2009), *aff'd o.b.*, 201 *N.J.* 5, 986 *A.2d* 678 (2010), and are therefore subject to de novo review, *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan*, 140 *N.J.* 366, 378, 658 *A.2d* 1230 (1995).

■■■■ As always, our primary "objective [in] statutory interpretation is to discern and effectuate the intent of the Legislature." *Murray v. Plainfield Rescue Squad*, 210 *N.J.* 581, 592, 46 *A.3d* 1262 (2012). "If the Legislature's intent is clear on the face of the statute, then we must apply the law as written." *Ibid.* "Absent a clear indication from the Legislature that it intended statutory language to have a special limiting definition, we must presume that the language used carries its ordinary and well-understood meaning." *State v. Lenihan*, 219 *N.J.* 251, 262–63, 98 *A.3d* 533 (2014). "[L]egislative language must not, if reasonably avoidable, be found to be inoperative, superfluous or meaningless." *State v. Regis*, 208 *N.J.* 439, 449, 32 *A.3d* 1109 (2011) (quoting *Franklin Tower One, L.L.C. v. N.M.*, 157 *N.J.* 602, 613, 725 *A.2d* 1104 (1999)). Yet, when statutory language is ambiguous, or "leads to more than one plausible interpretation," the court "may turn to extrinsic evidence, 'including legislative history, committee reports, and contemporaneous construction.'" *DiProspero v. Penn*, 183 *N.J.* 477, 492–93, 874 *A.2d* 1039 (2005) (quoting *Cherry Hill Manor Assocs. v. Faugno*, 182 *N.J.* 64, 75, 861 *A.2d* 123 (2004)).

### A.

■■■■ We begin with a review of the DJA, which provides as follows:

A person ... whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder.

[*N.J.S.A.* 2A:16–53.]

By vesting New Jersey courts with the "power to declare rights, status and other legal relations, whether or not further relief is or could be claimed," *N.J.S.A.* 2A:16–52, the DJA provides all individuals and organizations, public or private, with a forum to present bona fide legal issues to the court for resolution, *N.J.S.A.* 2A:16–53. The Legislature intended the Act to provide "relief from uncertainty and insecurity with respect to rights, status and other legal relations." *N.J.S.A.* 2A:16–51. The primary goal of affording this equitable relief is to allow interested parties to preserve the status quo without having to undergo costly and burdensome proceedings. *DiFrancisco v. Chubb Ins. Co.*, 283 *N.J.Super.* 601, 613, 662 *A.*2d 1027 (App. Div. 1995).

▬▬▬▬ Although any such declaration by the court carries "the force and effect of a final judgment," *N.J.S.A.* 2A:16–59, the Judiciary is forbidden from "declar[ing the] rights or status of parties upon a state of facts which are future, contingent and uncertain." *Lucky Calendar Co. v. Cohen*, 20 *N.J.* 451, 454, 120 *A.*2d 107 (1956) (quoting *Tanner v. Boynton Lumber Co.*, 98 *N.J. Eq.* 85, 89, 129 *A.* 617 (Ch. 1925)). The prohibition of advisory opinions prevents courts, "through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 *U.S.* 136, 148, 87 *S.Ct.* 1507, 1515, 18 *L.Ed.*2d 681, 691 (1967). It follows, then, that a declaratory judgment claim is ripe for adjudication only when there is an actual controversy, meaning that the facts present "concrete contested issues conclusively affecting" the parties' adverse interests. *N.J. Turnpike Auth. v. Parsons*, 3 *N.J.* 235, 241, 69 *A.*2d 875 (1949) (citation omitted).

Finally, the DJA is a remedial statute that "shall be liberally construed and administered, and shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it, and to harmonize, as far as possible, with federal laws, rules and regulations on the subject of declaratory judgments." *N.J.S.A.* 2A:16–51. However, there is "ordinarily no reason to invoke the provisions of the Declaratory

Judgments Act where another adequate remedy is available."
*Rego Indus., Inc. v. Am. Modern Metals Corp.*, 91 *N.J.Super.* 447,
453, 221 *A.2d* 35 (App. Div. 1966).

### B.

OPRA was "designed to promote transparency in the
operation of government." *Sussex Commons Assocs., LLC v.
Rutgers*, 210 *N.J.* 531, 541, 46 *A.3d* 536 (2012). Its purpose is "to
maximize public knowledge about public affairs in order to ensure
an informed citizenry and to minimize the evils inherent in a
secluded process." *Mason v. City of Hoboken*, 196 *N.J.* 51, 64, 951
*A.2d* 1017 (2008) (quoting *Asbury Park Press v. Ocean Cty.
Prosecutor's Office*, 374 *N.J.Super.* 312, 329, 864 *A.2d* 446 (Law
Div. 2004)). Such "broad public access to information" allows the
public to police "wasteful government spending and guard[ ]
against corruption and misconduct." *Burnett, supra*, 198 *N.J.* at
414, 968 *A.2d* 1151. Although OPRA is "not intended [to be] a
research tool [that] litigants may use to force government officials
to identify and siphon useful information," *MAG Entm't, LLC v.
Div. of Alcoholic Beverage Control*, 375 *N.J.Super.* 534, 546, 868
*A.2d* 1067 (App. Div. 2005), it makes all government records
presumptively accessible to the public unless an exemption ap-
plies, *N.J.S.A.* 47:1A–1; *see also Mason, supra*, 196 *N.J.* at 57, 951
*A.2d* 1017. OPRA's twenty-one exemptions are to be "construed in
favor of the public's right of access[.]" *N.J.S.A.* 47:1A–1.

If a records request is denied, section 6 of OPRA provides that
the requesting party may "institute a proceeding to challenge the
custodian's decision by filing an action in Superior Court" or with
the Government Records Council. *N.J.S.A.* 47:1A–6. To ensure
that the average citizen is not deterred from challenging an
agency's decision due to the financial risk involved, OPRA allows
an award of a reasonable attorney's fee to a "requestor who
prevails in any proceeding." *Ibid.*

Actions under section 6 of OPRA "shall proceed in a
summary or expedited manner," with the public agency bearing

the burden of proving "that one of [the] exemptions or exceptions incorporated in the statute by reference is applicable to the requested disclosure." *Tractenberg v. Township of West Orange,* 416 *N.J.Super.* 354, 378–79, 4 *A.*3d 585 (App. Div. 2010) (quoting *Asbury Park Press, supra,* 374 *N.J.Super.* at 329, 864 *A.*2d 446). In order to meet this burden, the agency must present "specific reliable evidence sufficient to meet a statutorily recognized basis for confidentiality." *Courier News v. Hunterdon Cty. Prosecutor's Office,* 358 *N.J.Super.* 373, 382–83, 817 *A.*2d 1017 (App. Div. 2003). Speculation is not sufficient to override "the overarching public policy in favor of a citizen's right of access" that guides our courts. *Id.* at 383, 817 *A.*2d 1017. "Absent such [specific reliable evidence], a citizen's right of access is unfettered." *Ibid.*

Despite a clear commitment to transparency, OPRA recognizes a privacy exception by requiring public agencies "to safeguard from public access a citizen's personal information" when "disclosure thereof would violate the citizen's reasonable expectation of privacy." *N.J.S.A.* 47:1A–1; *Burnett, supra,* 198 *N.J.* at 414, 427–28, 968 *A.*2d 1151. When OPRA's privacy exemption is at issue, courts apply a seven-factor balancing test to determine whether the citizen's interest in privacy outweighs the public's interest in governmental transparency. *Burnett, supra,* 198 *N.J.* at 427, 968 *A.*2d 1151 (adopting factors identified in *Poritz, supra,* 142 *N.J.* at 88, 662 *A.*2d 367). Those factors are discussed below. *See infra* Part V.A.

IV.

With the pertinent provisions of OPRA and the DJA in mind, we now consider whether the two statutes can be harmonized to resolve the ultimate question before the Court: whether a public entity, after denying an OPRA request, can institute an action against the requestor under the DJA to determine whether the requested documents should be disclosed.

The DJA is a general statute that provides broad access to our courts as "a means by which rights, obligations and status may be adjudicated in cases involving a controversy that has not yet reached the stage at which either party may seek a coercive remedy." *Rego, supra*, 91 *N.J.Super.* at 452–53, 221 *A.*2d 35; *see N.J.S.A.* 2A:16–51. Conversely, OPRA limits access to the courts by conferring the right to initiate a suit only upon the requestor, after a public agency's denial of access. *N.J.S.A.* 47:1A–6.

Here, when the Association received its first records request after it was declared a public entity, an actual controversy existed: the Association and Carter had "genuine differences" as to the Association's duty to disclose under OPRA. *See N.J. Ass'n for Retarded Citizens v. Dep't of Human Servs.*, 89 *N.J.* 234, 242, 445 *A.*2d 704 (1982). However, the Association's denial of access extinguished the controversy because the Association had determined its legal obligation with regard to the relief checks. At that point, it was not appropriate for the Association to rely on the DJA because the controversy had reached a stage at which Carter could seek a coercive remedy by way of section 6 of OPRA. Without a live dispute, any judicial declaration on the Association's right to deny access to the relief checks would have amounted to an impermissible advisory opinion.

Moreover, OPRA clearly and unambiguously confers the right to initiate a suit <u>after</u> a public agency's denial of access only upon the requestor. *N.J.S.A.* 47:1A–6. In the absence of legislative intent to the contrary, as is the case here, a specific statutory provision dealing with a particular subject prevails over a general provision. *Trinity Cemetery Ass'n, Inc. v. Township of Wall*, 170 *N.J.* 39, 46, 784 *A.*2d 52 (2001). We therefore conclude that section 6 of OPRA's special procedure for review of an agency's denial must prevail over the general DJA statute. Accordingly, after an agency has denied a request, section 6 is triggered, and only the requestor may seek judicial review of the agency's decision.

We do not reach the question of whether a public entity may file a pre-denial declaratory judgment action when confronted with an unsettled question that has not been litigated before and that implicates OPRA's privacy prong, *N.J.S.A.* 47:1A–1.

## V.

 Although we have determined that the Association's DJA action is moot, in the interest of judicial economy, we nevertheless choose to decide whether OPRA's privacy exception applies to the relief checks issued by the Association to Doe. *See Mystic Isle Dev. Corp. v. Perskie & Nehmad*, 142 *N.J.* 310, 322, 662 *A.*2d 523 (1995) (recognizing value in related claims being resolved in one adjudication to avoid "fragmented, multiple and duplicative litigation").

### A.

 The Association concedes that, following its designation as a public agency in 2013, its relief applications and payment checks are government records and presumptively accessible under OPRA. *N.J.S.A.* 47:1A–1. The Association contends, however, that those government records are exempt from disclosure because of its obligation under OPRA to safeguard citizens' reasonable expectation of privacy. *Ibid.* As this case presents a clash between two of OPRA's key competing interests—disclosure and protection of privacy interests—we apply the seven-factor balancing test adopted in *Burnett, supra,* 198 *N.J.* at 427, 968 *A.*2d 1151, and consider:

(1) the type of record requested; (2) the information it does or might contain; (3) the potential for harm in any subsequent nonconsensual disclosure; (4) the injury from disclosure to the relationship in which the record was generated; (5) the adequacy of safeguards to prevent unauthorized disclosure; (6) the degree of need for access; and (7) whether there is an express statutory mandate, articulated public policy, or other recognized public interest militating toward access.

We conclude that a balancing of those factors weighs in favor of non-disclosure.

First, financial assistance applications and payments to a specific individual are considered government records that are kept,

made, or maintained in the course of the Association's official business. Although a government record, the Association claims that relief applications often contain the complete personal financial history of individual applicants and should receive more protection than welfare applications and individual pension records, which are protected under *N.J.S.A.* 47:1A–10.

In applying the second and third factors, we find that the potential harm that could be created by the release of this information is unlimited—identity theft, public embarrassment, general loss of privacy, and so on. If disclosure is required, individuals seeking benefits will fear that sensitive information could be made public. Fourth, the release of this information would likely create a chilling effect among applicants for fear that the information may be subject to public scrutiny.

Fifth, the Association has established a safeguard to prevent disclosure by converting applicants' names into unique identification numbers. This also helps the Association objectively evaluate each applicant's claim for relief. If the Association were forced to disclose information with applicants' names, it would undermine this procedure.

Sixth, even if the public had a significant interest in evaluating the Association's decision-making process in affording relief to its members, there is little public need to release a single individual's application. Finally, under the seventh factor, there is no public policy or recognized interest that requires access here.

Because all factors weigh in favor of non-disclosure, we hold that the Association properly denied Carter's request in order to protect Doe's privacy interest in the records. Accordingly, we reverse the Appellate Division's judgment releasing the relief checks and awarding attorney's fees to Carter under OPRA.

### B.

The common law right of access remains a distinct basis upon which to access public records. *Bergen Cty. Improve-*

*ment Auth. v. N. Jersey Media Grp., Inc.*, 370 *N.J.Super.* 504, 516, 851 *A.*2d 731 (App. Div. 2004). Under the common law, a public record is

> one required by law to be kept, or necessary to be kept in the discharge of a duty imposed by law, or directed by law to serve as a memorial and evidence of something written, said, or done, or a written memorial made by a public officer authorized to perform that function, or a writing filed in a public office. The elements essential to constitute a public record are that it be a written memorial, that it be made by a public officer, and that the officer be authorized by law to make it.
>
> [*Nero v. Hyland*, 76 *N.J.* 213, 222, 386 *A.*2d 846 (1978) (alterations removed) (quoting *Josefowicz v. Porter*, 32 *N.J.Super.* 585, 591, 108 *A.*2d 865 (App. Div. 1954)).]

Thus, to receive access to a public record under the common law, (1) the record requested must be a common-law public document; "(2) the person seeking access must 'establish an interest in the subject matter of the material,'" *Keddie v. Rutgers*, 148 *N.J.* 36, 50, 689 *A.*2d 702 (1997) (quoting *S. Jersey Publ'g Co. v. N.J. Expressway Auth.*, 124 *N.J.* 478, 487, 591 *A.*2d 921 (1991)); "and (3) the citizen's right to access 'must be balanced against the State's interest in preventing disclosure,'" *ibid.* (quoting *Higg–A–Rella, Inc. v. County of Essex*, 141 *N.J.* 35, 46, 660 *A.*2d 1163 (1995)).

 Because the Association requires that applicants compile information for the Association to complete its public function of awarding relief benefits, the information is created at the behest of the Association. Therefore, the relief checks are public records under the common law, a point the Association does not presently contest. Carter's claimed interest in the checks is to shed light on the firefighter benefits award process.

 Like OPRA, when confidentiality concerns are raised under the common law right of access, courts balance the requestor's interest in disclosure against the government's interest in confidentiality. *Loigman, supra*, 102 *N.J.* at 108, 505 *A.*2d 958. "[T]he relative interests of the parties in relation to the specific materials in question" must be the center of the balancing process. *Piniero v. N.J. Div. of State Police*, 404 *N.J.Super.* 194, 206–07, 961 *A.*2d 1 (App. Div. 2008) (citing *McClain v. Coll. Hosp.*, 99 *N.J.*

346, 361, 492 *A.*2d 991 (1985)). When there is a confidentiality claim, the "applicant's interest in disclosure is more closely scrutinized." *Keddie, supra,* 148 *N.J.* at 51, 689 *A.*2d 702. With this in mind, courts consider whether the confidentiality claim is "premised upon a purpose which tends to advance or further a wholesome public interest or a legitimate private interest." *Loigman, supra,* 102 *N.J.* at 112, 505 *A.*2d 958 (quoting *City of St. Matthews v. Voice of St. Matthews, Inc.,* 519 *S.W.*2d 811, 815 (Ky. 1974)). Along with a requestor's motivation, *Loigman, supra,* identifies six factors that must be balanced in order to determine whether to disclose:

(1) the extent to which disclosure will impede agency functions by discouraging citizens from providing information to the government; (2) the effect disclosure may have upon persons who have given such information, and whether they did so in reliance that their identities would not be disclosed; (3) the extent to which agency self-evaluation, program improvement, or other decisionmaking will be chilled by disclosure; (4) the degree to which the information sought includes factual data as opposed to evaluative reports of policymakers; (5) whether any findings of public misconduct have been insufficiently corrected by remedial measures instituted by the investigative agency; and (6) whether any agency disciplinary or investigatory proceedings have arisen that may circumscribe the individual's asserted need for the materials. Against these and any other relevant factors should be balanced the importance of the information sought to the plaintiff's vindication of the public interest.

[102 *N.J.* at 104, 113, 505 *A.*2d 958.]

We conclude that a balancing of the six *Loigman* factors in this case militates against disclosure. First, disclosure of relief payments would discourage citizens who require benefits from applying for relief, and thus hamper the Association's ability to perform one of its core functions. Second, the entire relief process is conditioned on confidentiality. The remaining factors do not weigh heavily for or against disclosure. Therefore, on balance, the public's interest in access does not outweigh the Association's interest in non-disclosure.

Accordingly, we find that "[t]he dangers inherent in disclosure of confidential information for public dissemination are so obvious" that Doe's privacy interest "prevail[s] over the public interest in disclosing the information." *N. Jersey Media Grp., Inc. v. Bergen*

*Cty. Prosecutor's Office*, 405 *N.J.Super.* 386, 391, 964 *A.*2d 842 (App. Div. 2009).

## VI.

For the reasons set forth above, the judgment of the Appellate Division is reversed.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ–VINA and TIMPONE join in JUSTICE SOLOMON's opinion. JUSTICE ALBIN filed a separate, concurring opinion.

JUSTICE ALBIN, concurring.

I join the Court's opinion in full. I write separately to express my view that the New Jersey Open Public Records Act (OPRA), *N.J.S.A.* 47:1A–1 to –13, governs a records request, whether a public entity's records custodian denies the request or does not respond to the request. In other words, a records custodian, who intends to deny a records request but does not verbalize the denial, cannot invoke the Declaratory Judgment Act, *N.J.S.A.* 2A:16–50 to –62, to do an end run around the dictates of OPRA.

The Court's opinion states: "We do not reach the question of whether a public entity may file a pre-denial declaratory judgment action when confronted with an unsettled question that has not been litigated before and that implicates OPRA's privacy prong, *N.J.S.A.* 47:1A–1." *Ante* at 279, 166 *A.*3d at 1136-37 (emphasis added). I believe that the Legislature's clear intent in passing OPRA, however, answers that question—OPRA is the only statutory medium in which a citizen's records request can be adjudicated.

## I.

The Legislature enacted OPRA to occupy the field in addressing records requests made by citizens to public agencies. The Court's opinion explains that a citizen, whose records request is denied,

may " 'institute a proceeding to challenge the custodian's decision by filing an action in Superior Court' or with the Government Records Council," citing *N.J.S.A.* 47:1A-6. *Ante* at 276, 166 *A.*3d at 1135. The aggrieved requestor, thus, has two alternative forums in which to seek relief: one through our court system and the other through an administrative agency. The requestor—not the public agency—has the sole "right to institute any proceeding" arising from the denial of a records request. *N.J.S.A.* 47:1A-6. We denied the records custodian the power to initiate a declaratory judgment action against a requestor because to do so would violate the requestor's sole right to initiate litigation over a records issue and to decide the forum in which to seek relief. *Ante* at 276-77, 166 *A.*3d at 1135-36. OPRA does not allow a public agency to haul a records requestor before a Superior Court judge on an order to show cause to justify why he requested a document. A citizen whose records request is denied may have no intention to take the matter further and cannot be forced to litigate a matter against his will.

## II.

Every reason for denying a public agency the authority to file a declaratory action after the denial of a records request holds true after a request is made but before the custodian's denial. The Legislature did not intend that a records custodian could merely say nothing in response to a citizen's records request for the purpose of circumventing the citizen's "right to institute any proceeding" under OPRA. *See N.J.S.A.* 47:1A-6. The citizen, who receives no response from the records custodian—like the citizen whose request is denied—cannot be dragged into Superior Court against his will by the records custodian through a declaratory judgment action. The records custodian, through strategic timing, cannot deprive the citizen of the statutory right of choosing whether to litigate a records request and, if so, selecting the forum, either Superior Court or the Government Records Council. To conclude otherwise would have a powerful chilling effect on

whether a citizen would even request a government record, thus defeating the entire purpose of OPRA. *See N.J.S.A.* 47:1A–1 ("[G]overnment records shall be readily accessible for inspection, copying, or examination by the citizens of this State.").

I believe that the logic of today's opinion and a fair reading of OPRA preclude a records custodian from resorting to a declaratory judgment action after a citizen makes a records request, regardless of whether the custodian voices a denial.

Having expressed this viewpoint, I fully concur with the Court's opinion.